SOUTHERN UNION COMPANY, Southern Union Gas Company, and Rio Grande Valley Gas Company, et al.,

v.

CITY OF EDINBURG.

No. 01–0785.

Supreme Court of Texas.

Argued Nov. 20, 2002.

Decided Oct. 31, 2003.

Rehearing Denied April 9, 2004.

Nancy R. Hudson, for Amicus Curiae Texans for Reasonable Legal Fe.

Joe R. Greenhill, for Amicus Curiae Texas Civil Justice League.

Luther H. Soules, III, Jerry J. Fulton, Eduardo R. Rodriguez, Paul D. Andrews, Sara Murray, B. Mills Latham, James P. Wallace, Reagan W. Simpson, for other interested parties.

David C. Garza, for Mercado Gas Services, Inc.

J.A. (Tony) Canales, E. Lee Parsley, for Rio Grande Valley Gas Company.

Daniel W. Bishop, Jerry K. Clements, for Southern Union Company.

Christina Carlson Dodds, Cynthia Keely Timms, E. Lee Parsley, for Southern Union Gas Company.

Russell S. Post, Jennifer Bruch Hogan, Benjamin L. Hall, III, Elizabeth B. Hawkins, John R. Leach, III, Dana C. Livingston Cobb, Robert M. Roach, Jr., Sheryl A. Scott, J. Brett Busby, for City of Edinburg.

Justice OWEN delivered the opinion of the Court.

The City of Edinburg entered into franchise agreements with Rio Grande Valley Gas Company, to whom we will refer as RGVG, that were embodied in ordinances

of the City. The ordinance at issue in this case, Ordinance No. 1129, permitted RGVG to install and operate pipeline facilities on or under public rights-of-way and other public lands within the City or areas annexed by the City and to distribute and sell natural gas. The ordinance required RGVG to pay a franchise tax of "four (4%) percent of its gross income derived from all gas sales within the City." RGVG was subsequently acquired by and merged into Southern Union Company, to whom we will refer as Southern Union.

The principal issue in this case is whether gas purchased by consumers within the City from companies affiliated with RGVG and Southern Union is subject to the 4% franchise tax under Ordinance No. 1129 based on a theory of "single business enterprise." We hold that it is not, and we accordingly affirm the court of appeals' judgment in part, reverse in part, and render judgment that the City take nothing.

## I

RGVG has supplied gas to consumers in the City of Edinburg under a series of franchise agreements since 1926. The agreement at issue was reached and became effective in 1985. As noted above, this franchise agreement was embodied in Ordinance No. 1129. Until 1993, RGVG was a subsidiary of Valero Energy Corporation. In 1993, RGVG was acquired by Southern Union and merged into that corporation. Southern Union assumed all of RGVG's rights and obligations under Ordinance No. 1129, with the approval of the City. RGVG, like Southern Union, was a "local distribution company" and a "gas utility" within the meaning of the Texas Utilities Code.[1] This meant that the rates at which RGVG and subsequently Southern Union sold gas were regulated. The

City authorized RGVG and Southern Union to include all payments for franchise taxes in their rates and thus pass the franchise taxes on to ratepayers.

Until 1985, RGVG bought all of its gas from Valero Transmission Company, one of its affiliates. Valero Transmission Company's sales to RGVG were also regulated and were made at rates specified in tariffs filed with and approved by the Texas Railroad Commission. Commencing in 1985, pursuant to a settlement of a Railroad Commission proceeding to which the City was a party, RGVG began buying twenty percent of its gas from another affiliated company, Reata Industrial Gas Company, in order for RGVG to lower its gas costs. Reata Industrial Gas Company was a so-called special marketing program or "SMP" that was authorized to buy spot-market gas and sell it at unregulated, market rates. RGVG's purchases from Reata Industrial Gas Company were rolled in with its other gas supplies and resold to consumers within the City. RGVG's purchases from Reata Industrial Gas Company are not at issue. But Reata subsequently began making direct sales to consumers within the City. Those and other direct sales by special marketing companies affiliated with RGVG and Southern Union are at issue.

The emergence of SMPs like Reata Industrial Gas Company were part of changes in the natural gas industry that began occurring in the 1980s and the Railroad Commission's response to those changes. The Commission authorized new ways for consumers to obtain and suppliers and transporters to supply or transport natural gas. This Court considered the validity of some of these regulatory developments in *Railroad Commission of*

1. TEX.   UTIL.   CODE   §§ 101.003(7),   121.001(a).

*Texas v. Lone Star Gas Co.*[2] Although the evolution of the natural gas industry and regulatory responses, including deregulation for certain types of suppliers, are not directly material to the present dispute, they are the background against which the issues presented in this case arose.

Gas supplies became available to gas consumers from spot-market suppliers that were cheaper than the regulated gas offered for sale by regulated local distributions companies like RGVG. But RGVG owned or operated all the existing facilities within the City. In order for consumers to have access to cheaper gas supplies, they would have to obtain transportation from RGVG or build their own pipeline system. The latter option was feasible for only a very few of the largest gas consumers. Under market and regulatory pressure, RGVG filed new tariffs that allowed it to transport gas for many consumers who chose to buy gas from suppliers other than RGVG. This was done with the approval of both the Railroad Commission and the City. Transportation of gas that consumers purchased from suppliers other than RGVG was thus designed to and did displace many of the sales that RGVG had formerly made. The Railroad Commission refused to limit this "by-pass" of local distribution companies like RGVG. RGVG's tariffs, approved by both the Commission and the City, required it to offer transportation on a non-discriminatory basis to certain classes of gas consumers in the City. The transportation tariffs were embodied in ordinances other than Ordinance No. 1129, and the City was entitled to receive fees or taxes for transportation under those ordinances.

Some of the largest purchasers of natural gas in the City chose to purchase gas from sources other than RGVG. One user eventually bypassed the RGVG system completely by obtaining gas from suppliers that had no relation at all to RGVG and by using pipeline facilities that were totally separate from those of RGVG or any of its affiliates. Other large consumers chose to purchase spot-market gas from Reata Industrial Gas Company, which was an affiliate of RGVG until 1993. As indicated above, the stock of RGVG was owned by Valero Energy Corporation until Southern Union acquired RGVG in 1993, but RGVG was the only Valero entity that Southern Union acquired. Valero Energy Corporation also owned the stock of Valero Natural Gas Company, which in turn owned the stock of Reata Industrial Gas Company and another company, Valero Transmission Company. In 1987, Reata Industrial Gas Company and Valero Transmission Company became the general partners of Reata Industrial Gas, L.P. ("Reata, L.P.") and Valero Transmission, L.P. All of Reata Industrial Gas Company's and Valero Transmission Company's assets, including gas sales contracts, were transferred to Reata, L.P. and Valero Transmission, L.P., respectively. Thereafter, Reata, L.P. made spot-market gas sales to consumers within the City, and this gas was transported by RGVG.

In 1993, as part of the transaction in which Southern Union acquired RGVG from Valero Energy Corporation, it was agreed that Reata, L.P., which continued to be a Valero Energy Corporation affiliate, would market gas to industrial customers within the City for two years without competition from Southern Union, other than the regulated sales made by Southern Union as RGVG's successor. After that, Mercado Gas Services, Inc. ("Mercado"), a subsidiary of Southern Union, competed with Reata, L.P. and sold gas to some large industrial customers

2. 844 S.W.2d 679 (Tex.1992).

within the City. Southern Union transported gas for both Reata, L.P. and Mercado.

Not all of the gas transported by RGVG and Southern Union for users within the City was supplied by their affiliates. At least two industrial consumers purchased gas from suppliers that had no corporate relation to RGVG or Southern Union. At some point, the City took the position that all gas sold by any company to consumers within the City was subject to the 4% franchise tax under Ordinance No. 1129 if the gas was delivered by means of either RGVG's or Southern Union's facilities. Southern Union and the Valero entities disagreed with this interpretation of Ordinance No. 1129, and the City filed suit. The City contended that RGVG, Southern Union, and certain of their respective affiliated companies devised a scheme to avoid paying the 4% franchise tax on gas that was sold to consumers within the City by companies other than RGVG and Southern Union. The City asserted various theories on which it contended it was entitled to recover damages for the lost franchise fees.

The City asserted other claims as well. In 1987, RGVG had transferred the ownership of its gas transmission system, including about seven miles of lateral lines within the City, to an affiliated company. At the time of trial, these facilities were owned by Valero Transmission, L.P. The City contended that these transfers were made without its consent and in violation of Ordinance No. 1129. The City also contended that the operation of these laterals by Valero Transmission, L.P. constituted a purpresture in public property.[3]

After a lengthy trial, the jury found:

1) RGVG committed fraud against the City in connection with entering into Ordinance No. 1129;

2) The City did not waive or ratify such fraud and was not estopped from complaining about that fraud;

3) RGVG, Valero Transmission Company, and Reata Industrial Gas Company were not part of a conspiracy to commit fraud against the City in connection with entering into Ordinance No. 1129;

4) The amounts that would compensate the City for RGVG's fraud were $584,517.26 for October 1, 1985 to September 30, 1993, and $235,258.74 for October 1, 1993 to the time of trial (August 18, 1998);

5) RGVG, prior to October 1, 1993, and Southern Union, on and after October 1, 1993, failed to comply with Ordinance No. 1129 with respect to payments due under the ordinance;

6) RGVG's and Southern Union's failure to comply was not excused by the City's fraud, waiver, or ratification, and the City was not estopped from complaining of the failure to comply;

7) The amounts that would compensate the City for the failure to comply were $584,517.26 for October 1, 1985 to September 30, 1993, and $235,258.74 for October 1, 1993 to the time of trial (August 18, 1998);

8) RGVG sold, transferred or assigned rights, privileges or duties required by Ordinance No. 1129 to be performed by RGVG without the express written consent of the City first being obtained considering Ordinance No. 1129 in its entirety;

3. The jury in this case was instructed that "a 'purpresture' is an encroachment without consent or permission upon public rights, property or easements or the appropriation to private use of that which belongs to the public."

8a) RGVG's sale, transfer or assignment of rights, privileges or duties required by Ordinance No. 1129 to be performed by RGVG was not excused by the City's fraud, waiver, estoppel, or ratification;

9) Damages for such failure to comply were $4,000,000;

10) The City was entitled to attorneys' fees totaling $3,518,085 for trial and any appeals;

11) Valero Energy Corporation was responsible for the conduct of RGVG from October 1, 1985 to September 30, 1993;

12) RGVG, Valero Energy Corporation, Valero Transmission Company, Valero Natural Gas Company, and Reata Industrial Gas Company operated as a single business enterprise from October 1, 1985 to September 30, 1993;

13) Valero Transmission Company, Valero Transmission, L.P., Reata Industrial Gas Company, Reata, L.P., Valero Natural Gas Company, and Mercado intentionally interfered with Ordinance No. 1129;

14) None of those companies interfered because it had a good faith belief that it had a right to do so;

15) With regard to damages for such interference, the jury found:

| | |
|---|---|
| Reata, L.P. | $30,000 |
| Reata Industrial Gas Company | $50,000 |
| Mercado | $80,000 |
| Valero Transmission Company | $1,333,333.33 |
| Valero Transmission, L.P. | $1,333,333.33 |
| Valero Natural Gas Company | $1,333,333.33 |

16) The gas facilities of Valero Transmission, L.P. constituted a purpresture in public property in the City's property;

17) Exemplary damages of $300,000 should be assessed against RGVG; and

18) Valero Transmission Company, Valero Transmission, L.P., Reata Industrial Gas Company, Reata, L.P., Valero Natural Gas Company, and Mercado did not act with actual malice.

The trial court rendered judgment awarding the City:

1) actual damages of $3,301,183.92 for breach of contract and tortious interference, prejudgment interest of $1,069,110.72, and post-judgment interest from RGVG, Southern Union, Valero Energy Corporation, Valero Transmission Company, Valero Natural Gas Company, and Reata Industrial Gas Company, jointly and severally;

2) actual damages of $253,258.74, prejudgment interest of $76,442.98, and post-judgment interest from Southern Union for breach of contract;

3) attorneys' fees totaling $3,518,085 for trial and any appeals from RGVG, Southern Union, Valero Energy Corporation, Valero Transmission Company, Valero Natural Gas Company, and Reata Industrial Gas Company, jointly and severally;

4) $300,000 in exemplary damages from RGVG, together with post-judgment interest;

5) $1,333,333.33, prejudgment interest of $433,242, and post-judgment interest from Valero Transmission, L.P. for tortious interference;

6) $30,000, prejudgment interest of $7,619.18, and post-judgment interest from Reata, L.P. for tortious interference; and

7) $80,000, prejudgment interest of $20,317.81, and post-judgment interest from Mercado for tortious interference.

The trial court declared that certain pipelines and facilities located in the City

constituted a purpresture in public property in the City's rights-of-way and an encroachment on the City's property without its permission. The trial court also declared that Valero Energy Corporation used RGVG as its alter ego and was vicariously liable for RGVG's conduct from October 1, 1985 to September 30, 1993, and that Southern Union was liable for any liabilities of RGVG from October 1, 1985 to the date of judgment (December 1, 1998). However, the trial court disregarded the jury's finding of $4,000,000 in damages for RGVG's transfer of rights or privileges under Ordinance No. 1129 without the City's consent.

All parties appealed. The court of appeals reversed the trial court's judgment in part, modified it, and affirmed the award of all attorneys' fees.[4] The court concluded that the "single business enterprise" theory was a valid means under Texas law "of disregarding the corporate form," and that this theory was not confined to providing a means of collecting a judgment from more than one defendant.[5] The court of appeals also concluded that the finding by the jury that five of the defendants (RGVG, Valero Energy Corporation, Valero Transmission Company, Valero Natural Gas Company, and Reata Industrial Gas Company) operated as a "single business enterprise" applied to all causes of action asserted by the City.[6] With regard to the breach of contract claim, the court of appeals held that "the contractual obligations of the franchise agreement extend throughout the Valero family, and the Valero appellants were responsible for collecting and paying franchise fees on all Valero gas sales inside the city, whether the gas was nominally sold by RGVG or by Reata."[7] The court of appeals upheld the measure of damages awarded for breach of the franchise agreement by RGVG, concluding that there was evidence to support it.[8]

The court of appeals held, however, that Southern Union had no corporate affiliation with the Valero corporations and therefore that "the same analysis does not apply when the transporter is outside the corporate family."[9] The court of appeals held that the obligation to pay franchise fees on sales by Reata ended when Southern Union became the franchisee.[10] The court of appeals accordingly reversed the damage award against Mercado and the damages assessed directly against Southern Union.[11]

With regard to the transfer of lateral pipelines by RGVG, the City contended that the trial court erred in disregarding the jury's verdict awarding $4,000,000. The court of appeals disagreed, holding that the City's pleadings did not support submission of the liability question on this issue.[12]

With regard to tortious interference, the court of appeals concluded that to the extent the jury made findings regarding RGVG's transfer of the lateral lines to other entities, the issue should not have been submitted because the pleadings did not support such a submission.[13] Howev-

4.  59 S.W.3d 199.

5.  *Id.* at 210.

6.  *Id.* at 212.

7.  *Id.* at 213.

8.  *Id.* at 216–17.

9.  *Id.* at 214.

10.  *Id.*

11.  *Id.* at 225.

12.  *Id.* at 215.

13.  *Id.* at 215–16.

er, the charge to the jury on interference contained two distinct theories, only one of which involved the transfer of the lateral lines. The other theory was based solely on loss of franchise tax revenue because of sales made by entities other than RGVG and Southern Union. The trial court awarded the full amount of damages found by the jury for tortious interference. Nevertheless, the court of appeals' opinion states that "[b]ecause the trial court disregarded the jury's answer regarding damages arising from the tortious interference question, we hold that the trial court's judgment was correct in this regard."[14] The opinion then says in a footnote, "[t]he only damages assessed against appellant Mercado Gas Services, Inc. were for tortious interference with contract. Because we remove the city's recovery on this claim, we render judgment that the city take nothing as to Mercado."[15] The court of appeals was not as clear as it could have been about its holding with regard to the interference findings. It expressly "remove[d]" the finding of damages against Mercado,[16] but not the trial court's awards against Valero Transmission Company, Valero Transmission, L.P., Reata, L.P., Valero Natural Gas Company, or Reata Industrial Gas Company. However, in the closing paragraph of its opinion, the court of appeals set forth the judgment that should be rendered, and no amounts for tortious interference were included.[17] The City contends in this Court that the court of appeals erred in reversing the awards for tortious interference. Based on the court of appeals' judgment, we conclude, as have the parties, that the court of appeals reversed the trial court as to all awards under the tortious interference claims.

The court of appeals also held that the City failed to plead a cause of action for fraudulent inducement.[18] The court of appeals therefore held that the City was not entitled to recover under such a theory, and it reformed the trial court's judgment to exclude the award of $300,000 in exemplary damages.[19]

The court of appeals rejected arguments that the City was barred by waiver, estoppel, or ratification from asserting its claims.[20] It also rejected arguments that the attorneys' fees awarded were not supported by competent evidence and should have been segregated between claims for which attorneys' fees are recoverable and claims for which fees are not recoverable.[21] The court of appeals further held that there could be no purpresture, which it defined as "an encroachment without consent on public rights, property, or easements, or the appropriation for private use of that which belongs to the public," because under the single business enterprise findings, Valero Transmission Company and RGVG were a single entity, and Valero Transmission, L.P., the owner of the laterals, was the successor in interest to Valero Transmission Company.[22]

The court of appeals also addressed the City's contentions with regard to a most-favored nations provision in Ordinance No. 1129. On rehearing, the court of appeals held that the most-favored nations provision applied to all of Southern Union's

14. *Id.* at 216.

15. *Id.* at 216 n. 5.

16. *Id.*

17. *Id.* at 225.

18. *Id.* at 217–18.

19. *Id.* at 218.

20. *Id.* at 218–19.

21. *Id.* at 221–24.

22. *Id.* at 224–25.

franchise agreements, not just to the area in which RGVG had franchises that had been limited to the Rio Grande Valley.[23] The court of appeals also held that Southern Union was not jointly and severally liable for trial and appellate attorneys' fees,[24] but then concluded on further rehearing that Southern Union was liable for all of RGVG's liabilities.[25]

All parties filed petitions for review in this Court, which we granted.[26] While the case was pending in this Court, the issue regarding the most-favored nations provision in Ordinance No. 1129 was settled, and that issue is no longer before us.

## II

■ The first issue we address is the proper construction of Ordinance No. 1129. The Ordinance says in pertinent part:

### SECTION 1.

Subject to the terms and conditions mentioned in this Ordinance, the right, privilege and franchise is hereby granted to Rio Grande Valley Gas Company, a Delaware corporation and to its successors, lessees and assigns, to acquire, install, construct, operate and maintain a system of mains, pipes, and laterals and the necessary plants, attachments and appurtenances for the purpose of supplying and distributing natural gas (including equivalent substitutes) for fuel, power, heat, light, and for other purposes in, through, upon, under, and along the streets, avenues, alleys, highways, parks and other public places . . . ;

and to distribute, supply and convey said natural gas through a system of mains, pipes, and laterals, for the purpose of distributing, supplying, and selling natural gas for fuel, power, heat, light and for any other purpose, to other cities, towns, communities and areas outside the City Limits of Edinburg and to the inhabitants thereof, for the full term of this franchise.

\* \* \*

### SECTION 3.

The Grantee, its successors, lessees or assigns, shall at all times be subject to any Ordinances now in existence, or which may hereafter be passed, not inconsistent herewith. No fee or other charge of any kind shall be imposed upon the Grantee, or upon any consumer of gas for the breaking or opening of any streets or other public places or for the laying of mains, service pipes or other connections therein except as provided for hereunder.

\* \* \*

### SECTION 5.

Grantee, and its successors and assigns, shall have the right to adopt and enforce Rules of Service for service hereunder not inconsistent with law or this Ordinance. Grantee shall supply gas and provide service at the rates and under the terms and conditions specified by such rules and as provided herein.

---

23. 59 S.W.3d 225, 228.

24. *Id.* at 229.

25. *Id.* at 230.

26. Valero Energy Corporation was acquired by PG & E Gas Transmission Corporation after the dispute in this case arose, and after RGVG had been acquired by Southern Union. Then, while this case was pending in the

court of appeals, El Paso Gas Transmission Company and other El Paso entities acquired or succeeded the PG & E entities. To minimize confusion to the greatest extent possible, we will refer to the former Valero entities using the names under which they were formerly known rather than their names after the PG & E and El Paso acquisitions or mergers.

a. The Grantee shall not charge or receive any higher rate for natural gas furnished by it to any domestic customer within the City Limits than the rate fixed by the regulatory authority having jurisdiction or permitted by applicable laws.

\* \* \*

c. Grantee shall charge and receive for natural gas furnished by it to any commercial and industrial customer within the City Limits such rates as it may from time to time establish, but there shall be no discrimination in rates between industrial customers using equal daily quantities of gas under similar conditions.

\* \* \*

*SECTION 11.*

a. The Grantee, by accepting or acting under this grant, shall pay to the City of Edinburg, as a franchise tax and as compensation for the rights and privileges enjoyed hereunder, during the life of this grant the amount indicated in paragraph b. immediately below [a most favored nations clause], or four (4%) percent of its gross income derived from all gas sales within the City of Edinburg, Texas, whichever is greater. Such payment shall be based on receipts for two (2) 6–month periods one beginning July 1 and ending December 31 and the other beginning January 1 and ending June 30. . . . This tax shall be in lieu of all other franchise, license or occupation taxes, levies, exactions, rentals or charges which may be levied or attempt-

ed to be levied by the said City of Edinburg, Texas.

The City contends that RGVG and subsequently its successor Southern Union were obligated to pay a 4% franchise tax on all gas sold within the City that went through RGVG's or Southern Union's pipeline system, regardless of what entity, affiliated or not, actually sold gas to consumers within the City. The City argues that the phrase "four (4%) percent of its gross income *derived from* all gas sales within the City"[27] includes income derived from transportation that was provided by RGVG or Southern Union in connection with gas sales within the City. The court of appeals was unpersuaded by this argument,[28] as are we.

First, the City does not limit its claim to gross income that RGVG or Southern Union "derived from" transporting gas sold by other suppliers. The City claims that it is entitled to 4% of the entire amount paid by gas consumers for gas, which includes payments to suppliers other than RGVG and Southern Union for the gas itself as well as payments to RGVG or Southern Union for transportation. At most, however, the City's "derived from" argument would entitle it to 4% of the transportation revenues that RGVG and Southern Union received.

Second, the language on which the City relies does not support its interpretation. If the reference to "all gas sales within the City" truly meant *"all"* gas sales within the City, regardless of who the seller was, how was the Grantee to derive income from "all" sales if it had no participation whatsoever, even as a transporter, in some

27. Emphasis added.

28. 59 S.W.3d at 214 ("The only gross income [Southern Union] derived from sales of spot-market gas inside the city was its transportation revenue. While evidence was presented at trial establishing that the city had passed a separate ordinance setting rates and fees for 'transportation' of gas, the city did not seek damages in this litigation for lost transportation fees.").

sales within the City? The reference to "all gas sales within the City," read in context, means "its [the Grantee's] gross income derived from all gas sales [by the Grantee] within the City."

Other provisions of the franchise agreement reflect that in exchange for the bundle of rights granted to the Grantee, it was contemplated that there would be a single assessment based on *sales* of gas *by the Grantee.* The Ordinance contemplates that *sales* will be made by the Grantee directly to customers in the City based on rates fixed by "the regulatory authority having jurisdiction or permitted by applicable law." As a regulated local distribution company and a gas utility within the meaning of the Texas Utilities Code,[29] RGVG and subsequently Southern Union could only make sales of gas at the rates and under the terms and conditions specified in their filed, approved tariffs. The sales made by Reata Industrial Gas Company, Reata, L.P., and Mercado, on the other hand, were unregulated.

The provisions of the franchise agreement reflect the parties' intent that the Grantee's "gross income derived from all gas sales within the City" meant gross income from the Grantee's sales within the City, not sales by other parties. This conclusion is consistent with the fact that this franchise agreement did not give the Grantee the exclusive right to sell gas within the City. Indeed, under Texas law,

the grant could not have been an exclusive one.[30] It is unreasonable to construe the franchise agreement to mean that the Grantee would have to pay franchise taxes on sales made by another company who had the lawful right to sell gas within the City.

The franchise agreement embodied in Ordinance No. 1129 does not expressly prohibit the Grantee from providing transportation services for other gas suppliers or for customers who buy gas from those other suppliers. Apparently, RGVG provided transportation services to customers in the City based on the rights granted to it in Ordinance No. 1129 from January 1986 until January 1988. The franchise tax that it paid to the City, however, continued to be calculated on "its gross income derived from all gas sales within the City." This resulted in less revenue to the City, and in January 1988, the City enacted Ordinance No. 1266, which approved tariff rate schedules that expressly permitted RGVG to transport gas for large-volume industrial consumers within the City and assessed fees or taxes for that transportation. Two other ordinances, Ordinance Nos. 1371 and 1465, were also enacted by the City to set a fee or tax on transportation that RGVG provided for consumers within the City. Yet, the City now contends that it is entitled to a franchise tax under Ordinance No. 1129 for transported gas rather than, or perhaps in addition to, fees or taxes assessed under

**29.** TEX. UTIL. CODE §§ 101.003(7), 121.001(a).

**30.** *See* TEX. CONST. art. I, § 26 ("Perpetuities and monopolies are contrary to the genius of a free government, and shall never be allowed, nor shall the law of primogeniture or entailments ever be in force in this State."); *see also Edwards County v. Jennings,* 89 Tex. 618, 35 S.W. 1053, 1054 (1896); *City of Brenham v. Brenham Water Co.,* 67 Tex. 542, 4 S.W. 143, 156 (1887); *Altgelt v. City of San Antonio,* 81 Tex. 436, 17 S.W. 75, 76 (1890);

*Gomez v. City Transp. Co. of Dallas,* 262 S.W.2d 417, 422 (Tex.Civ.App.-Dallas 1953, writ ref'd n.r.e.); *State v. Cent. Power & Light Co.,* 147 S.W.2d 330, 334 (Tex.Civ.App.-Beaumont 1941), *aff'd,* 139 Tex. 51, 161 S.W.2d 766 (1942); *Templeton v. City of Wellington,* 207 S.W. 186, 187–88 (Tex.Civ.App.-Amarillo 1918, no writ); *Ennis Waterworks v. City of Ennis,* 136 S.W. 513, 516–17 (Tex.Civ.App. 1911), *aff'd,* 105 Tex. 63, 144 S.W. 930 (1912).

these other ordinances. As the court of appeals observed, the City did not make any claim that RGVG or Southern Union failed to pay franchise taxes under the transportation ordinances. The City's only claim in this suit was under Ordinance No. 1129.

Perhaps recognizing the weakness in its interpretation of Ordinance No. 1129, the City contends in the alternative that sales made by affiliates of RGVG or Southern Union to consumers within the City should be subject to the franchise tax set forth in Ordinance No. 1129 under a theory of single business enterprise. We turn to that contention.

### III

■ The City asserts that the Valero companies, which included RGVG until it was purchased by Southern Union, were operated as a single business enterprise. Therefore, the City contends, any sales of gas made by any Valero-related entity within the City should be subject to the 4% franchise tax. The City also argues that the way in which the Valero companies were operated was a sham to defraud the City and that Southern Union joined in the sham after it acquired RGVG and continued to transport gas for Reata, L.P., an affiliate of Valero Energy Corporation. Southern Union later perpetrated a sham of its own, the City argues, when its affiliate, Mercado, sold gas to consumers within the City and Southern Union transported that gas. The "real seller," the City contends, was Southern Union, not Mercado.

The jury found that RGVG, Valero Energy Corporation, Valero Transmission Company, Valero Natural Gas Company, and Reata Industrial Gas Company operated as a single business enterprise from October 1985 to September 1993, when Southern Union acquired RGVG. The jury was not asked to find and thus did not make any findings regarding a single business enterprise as to Southern Union or the operation of any Valero entity after September 1993.

The claim that Southern Union is liable under a single business enterprise or "sham" theory is easily resolved, since there were no findings in the trial court to support such a claim. The City's contention that the court of appeals erred in reversing the trial court's judgment in this regard has no merit.

With regard to events occurring before Southern Union acquired RGVG in 1993, the Valero entities [31] challenge the City's single business enterprise theory on several bases. Among those challenges is the contention that this Court has never recognized such a theory and that there is no need for an additional theory for either piercing a corporate veil or imposing joint and several liability. The Valero entities, joined by Southern Union, also argue that the use of the single business enterprise theory in this case goes beyond piercing a corporate veil and imposing joint and several liability because a single business enterprise theory was used to transform the separate contracts of affiliated companies into contractual undertakings by all affiliated companies as if they were a single entity. The Valero companies and Southern Union urge this Court to clarify the law in Texas regarding the validity and parameters of the single business enterprise theory.

The Valero entities also contend that article 2.21 of the Texas Business Corpora-

---

**31.** As indicated in note 26 above, we will refer to the Valero entities as they were formerly known, not as they are or have been known

since the PG & E and El Paso acquisitions or mergers.

tion Act[32] governs liability under any theory of single business enterprise in this case and that the court of appeals improperly ignored article 2.21. The City counters that the theory of single business enterprise is well recognized by the courts of appeals in this state; that in any event, the charge to the jury essentially tracked article 2.21; and that there is evidence to support the jury's findings regarding single business enterprise.

This Court has never considered the "single business enterprise" concept in any detail. The only decision in which we have had occasion to comment at all on such a theory was in *George Grubbs Enterprises, Inc v. Bien.*[33] In that case, the sole issue we addressed was whether it was proper to instruct the jury that in assessing punitive damages against a corporation, it could consider the "wealth or profitability" of a corporate entity related to the defendant even though that related corporate entity was not a party to the case, if the jury concluded that the defendant and its affiliate were "operated as and constitute a single business enterprise."[34] In that case, the jury was instructed that a " 'single business enterprise' exists when two or more corporations associate together and, rather than operate as separate entities, integrate their resources to achieve a common business purpose."[35] In relating the procedural history, we said:

> Prior to submission of the case to the jury, the defendants objected to this instruction on the grounds that it erroneously omitted the factors necessary to determine whether Grubbs Enterprises

and Auto Park constituted a single business enterprise. *See, e.g. Paramount Petroleum v. Taylor Rental Ctr.*, 712 S.W.2d 534 (Tex.App.-Houston [14th Dist.] 1986, writ ref'd n.r.e.) (listing factors).[36]

We then said: "Assuming without deciding that it would *ever* be proper for the jury to consider the wealth of a related corporate entity which had not been joined as a defendant, we find that the instruction was inadequate for the reasons stated in the defendants' objection to the charge."[37] We then explained that exemplary damages "rest on justifications similar to those for criminal punishment," that if corporate structures were to be disregarded, there must be "a fact-specific analysis of each case," and that disregarding the corporate structure "demands jury instructions that advise the jury concerning all the factors bearing on their decision."[38] We held that "[b]ecause this 'single business enterprise' instruction seeks to disregard the corporate structure, the failure to submit all relevant factors to guide the jury's consideration was error."[39] We said nothing in this opinion to indicate that a "single business enterprise" theory was different from other theories already recognized to disregard corporate structure and hold one corporation liable for the debt or tort of another. We certainly said nothing in *George Grubbs* to indicate that a "single business enterprise" theory could be used to view the contracts of distinct corporations as the contracts of a single, amalgamated entity.

---

32. TEX. BUS. CORP. ACT art. 2.21.

33. 900 S.W.2d 337 (Tex.1995).

34. *Id.* at 338.

35. *Id.*

36. *Id.* at 338–39.

37. *Id.* at 339 (emphasis in original).

38. *Id.*

39. *Id.*

We need not decide today whether a theory of "single business enterprise" is a necessary addition to Texas law regarding the theory of alter ego for disregarding corporate structure and the theories of joint venture, joint enterprise, or partnership for imposing joint and several liability. That is because whatever label might be given to the City's attempt to treat the Valero entities as a single entity, article 2.21 of the Texas Business Corporation Act [40] controls, and the questions submitted to the jury were intended to embody the requirements of article 2.21.

Since 1993, article 2.21 has provided that, with certain exceptions that do not apply in this case, section A of article 2.21 is the exclusive means for imposing liability on a corporation for the obligations of another corporation in which it holds shares.[41] The current version of article 2.21 says:

> The liability of a holder, owner, or subscriber of shares of a corporation or any affiliate thereof or of the corporation for an obligation that is limited by Section A of this article is exclusive and preempts any other liability imposed on a holder, owner, or subscriber of shares of a corporation or any affiliate thereof or of the corporation for that obligation under common law or otherwise. . . . [42]

Section A of article 2.21 sets forth the basis on which a corporation may have an obligation with respect to its affiliate's contractual obligations:

> A. A holder of shares, an owner of any beneficial interest in shares, or a subscriber for shares whose subscription has been accepted, or any affiliate thereof or of the corporation, shall be under

no obligation to the corporation or to its obligees with respect to:

\* \* \*

> (2) any contractual obligation of the corporation or any matter relating to or arising from the obligation on the basis that the holder, owner, subscriber, or affiliate is or was the alter ego of the corporation, or on the basis of actual fraud or constructive fraud, a sham to perpetrate a fraud, or other similar theory, unless the obligee demonstrates that the holder, owner, subscriber, or affiliate caused the corporation to be used for the purpose of perpetrating and did perpetrate an actual fraud on the obligee primarily for the direct personal benefit of the holder, owner, subscriber, or affiliate; or

> (3) any obligation of the corporation on the basis of the failure of the corporation to observe any corporate formality, including without limitation: (a) the failure to comply with any requirement of this Act or of the articles of incorporation or bylaws of the corporation; or (b) the failure to observe any requirement prescribed by this Act or by the articles of incorporation or bylaws for acts to be taken by the corporation, its board of directors, or its shareholders.[43]

In connection with the single business enterprise question that was submitted to the jury in this case, the jury was instructed:

You are instructed that a single business enterprise exists when two or more corporations associate together and rather than operate as separate business enti-

40. TEX. BUS. CORP. ACT art. 2.21.

41. Act of May 7, 1993, 73rd Leg., R.S., ch. 215, § 2.05, 1993 Tex. Gen. Laws 418, 446.

42. TEX. BUS. CORP. ACT art. 2.21, § B.

43. TEX. BUS. CORP. ACT art. 2.21, § A.

ties, integrate their resources to achieve a common business purpose.

In order to answer this question "Yes", you must find that such single business enterprise was used for the purpose of perpetrating and did perpetrate an actual fraud on the City of Edinburg primarily for the direct personal benefit of the single business enterprise. "Actual fraud" as used above means conduct involving dishonesty of purpose or intent to deceive.

This instruction does not track article 2.21 precisely, but even under this instruction, there is no evidence to support a finding that RGVG or any of the Valero entities perpetrated an actual fraud on the City. The court of appeals incorrectly concluded: "To prove that there has been a sham to perpetrate a fraud, *tort* claimants must show only constructive fraud." [44] First, the City used the single business enterprise finding to underpin its *breach of contract* claim. There was no *tort* claim to which the single business enterprise finding could have applied, other than the fraud in the inducement claim, which we consider below. Second, the charge to the jury required a finding of actual fraud, not constructive fraud.

There is no evidence that RGVG or any of the Valero entities engaged in "conduct involving dishonesty of purpose" or that they acted with "intent to deceive" the City within the meaning of the jury charge. Indeed, the fact that RGVG transported gas sold by its affiliates to consumers within the City was well known to the City. The City even approved tariffs that set the terms and conditions for such transportation. Affiliates of RGVG had the legal right to sell gas to consumers in the City, and RGVG had the legal right to transport that gas. Ordinance No. 1129

was never intended to give, nor could it have given, RGVG the exclusive right to sell gas to consumers in the City.

The court of appeals based its conclusion that there was "constructive fraud" on the testimony of an expert witness who opined that whether gas was sold, as distinguished from transported, and the identity of the seller should be determined not by the written contractual agreements that governed sales and transportation, but by where the gas was metered. The expert opined that because gas was measured when it was delivered to a customer within the city, the "sale" took place at the customer's point of receipt within the City, and that since RGVG delivered the gas, it must have been the seller. In this expert's opinion, the gas purchase contracts consumers had with suppliers such as Reata, L.P. and the separate contracts that these consumers entered into with RGVG for transportation were a "sham." The court of appeals concluded that this expert testimony could override the express contractual provisions that evidenced distinct sales and transportation transactions. [45]

The court of appeals' conclusion is insupportable, both legally and factually. The quantity of gas transported and sold to a consumer can only be accurately measured by metering the volume of gas received by the consumer. The gas entering RGVG's pipeline system was also metered upstream of that delivery point, and allocations were made between that point and the various delivery points. Some of the gas in RGVG's system was purchased, transported, then resold by RGVG to consumers within the City. Other gas in RGVG's system had been purchased by other suppliers, including Reata, L.P. That gas was transported by RGVG, then resold

---

**44.** 59 S.W.3d at 209 (emphasis added).

**45.** *Id.* at 214.

by the other suppliers to consumers in the City. There is no allegation and no evidence that any of the allocations among RGVG, Reata, L.P., and other suppliers of the amounts sold or the amounts transported were inaccurate in any way. There is no evidence whatsoever of a "sham."

The court of appeals correctly recognized that when Southern Union provided transportation to Reata, L.P., just as RGVG had done, the expert's conclusion that the sales and transportation contracts were a mere sham could not withstand scrutiny. The court of appeals recognized that regardless of how or where the gas was metered, the sales were made by Reata, L.P., not Southern Union.[46] But the dichotomy the court of appeals saw between transportation by RGVG for Reata, L.P. and transportation by Southern Union for Reata, L.P. is illogical. The only distinction the court of appeals could draw between the two was that Southern Union was a transporter "outside the corporate family." [47] This distinction is immaterial. It does not matter whether the company that supplies the gas to consumers within the City is affiliated with RGVG or Southern Union, as long as the supplier is a separate corporate entity, and there is no basis for disregarding the separate corporate identities.

In an analogous situation in *Railroad Commission of Texas v. Lone Star Gas Co.*, we held that the separate existence of corporations was not disregarded "when affiliated purchasers use the same pipeline to transport gas." [48] In that case, the Railroad Commission had promulgated rules governing pipeline companies such as RGVG and Southern Union and their affiliated special marketing programs (SMPs) such as Reata, L.P. and Mercado. Under the Commission's rules and regulations, separate corporate entities were created as SMPs to buy cheaper spot-market gas and sell it to the affiliated pipelines' customers.[49] The rules that were challenged in *Lone Star* treated pipeline companies and their affiliated SMPs as one entity for purposes of preventing discriminatory production and taking of natural gas when the pipeline and the SMP used the same pipeline system, unless the SMP qualified as a first purchaser or applied for a hardship exception.[50] We held that operating in this manner, as required by the Commission's rules, did not disregard the separate corporate structures of the pipeline company and its SMP.[51] Similarly, the fact that RGVG and later Southern Union transported gas supplied by an affiliated company in the same manner and in the same pipeline system along with gas that RGVG and Southern Union sold to some of the same customers does not provide grounds for disregarding the separate corporate entities and their respective, separate contractual obligations.

The City argues that the Valero entities had common directors, shared employees, and had central accounting and payroll systems. We have held that such facts do not justify disregarding the corporate structures of affiliated companies.[52] But more importantly, proof of such facts would not establish liability under article

46. *Id.*

47. *Id.*

48. 844 S.W.2d 679, 690 (Tex.1992).

49. *Id.* at 684.

50. *Id.*

51. *Id.* at 690.

52. *See, e.g., BMC Software Belgium, N.V. v. Marchand,* 83 S.W.3d 789, 799 (Tex.2002).

2.21[53] or the charge given to the jury in this case.

There was no basis in this record for concluding that the distinct corporate identities of the Valero entities should be disregarded or that sales of gas by RGVG's affiliates to consumers within the City could be considered sales by RGVG under Ordinance No. 1129.

## IV

■ The jury found that RGVG sold, transferred or assigned "rights, privileges or duties required by Edinburg Ordinance No. 1129 to be performed by Rio Grande Valley Gas Company without the express written consent of the City of Edinburg first being obtained considering Ordinance 1129 in its entirety." The jury awarded $4,000,000 in damages for this claim. The jury was instructed in that regard:

Consider the following elements of damages, if any, and none other:

The difference, if any, between the value to the City of Edinburg of the rights, privileges or duties sold, transferred or assigned without the express written consent of the City of Edinburg being first obtained and the amount for which the City of Edinburg could have purchased such rights, privileges or duties. Do not include in your answer any amount that you find the City of Edinburg could have avoided by the exercise of reasonable care.

The trial court disregarded the jury's findings and refused to award any damages for this claim. The court of appeals affirmed, concluding that the City had not included this claim in its pleadings.[54] The City contends that it did adequately plead this claim and that the court of appeals

reversed on unpreserved and unassigned error.

In the interest of brevity, we will not parse through the pleading and preservation contentions or the myriad other contentions made by the parties with regard to this claim. That is because the trial court was correct in holding that there was no evidence to support any award of damages. The claim is based on RGVG's sale of its gas transmission system to Valero Energy Corporation in 1987. This included four laterals located within the City. Through other transactions, Valero Transmission, L.P. became the owner of the four laterals, which consisted of about seven miles of pipelines within the City. The City did not consent in writing to these transfers. Assuming, without deciding, that RGVG's transfer without the City's consent was in violation of Ordinance No. 1129, the City offered no evidence of any damages it suffered. One of the City's expert witnesses testified that RGVG's entire transmission system had a value of about $2,000,000 in 1987. The four laterals at issue were only a small fraction of this system. The expert did not offer any valuation of the four laterals and expressly testified that he did not calculate the value of the laterals. No other evidence was offered that even remotely indicated how the City was damaged. RGVG continued to discharge its responsibilities under Ordinance No. 1129 after title to the facilities was transferred to an affiliate. The trial court correctly disregarded the jury's findings on this claim, and the court of appeals did not err in affirming this aspect of the trial court's judgment.

## V

The City contends that the court of appeals erred in holding that the City could

---

**53.** TEX. BUS. CORP. ACT art. 2.21.

**54.** 59 S.W.3d at 215–16.

not prevail on its tortious interference claim. The jury found that Valero Transmission Company, Valero Transmission, L.P., Reata Industrial Gas Company, Reata, L.P., Valero Natural Gas Company, and Mercado intentionally interfered with Ordinance No. 1129. The jury was instructed: "Interference is intentional if committed with the belief that interference is substantially certain to result or with the desire to interfere with the contract." The jury also found that these companies interfered without a good faith belief that they had a right to do so. In this regard, the jury was instructed:

> A company is justified to interfere with Ordinance 1129 if: (1) such party possesses interests in the market for gas in Edinburg equal or superior to the rights of the parties to the contract; (2) such company has a good faith claim to a colorable legal right to interfere with the contract, even though that claim ultimately proves to be mistaken; or (3) such company has a good faith doubt as to the rights of the parties under the contract.

The instructions to the jury regarding damages for interference were complex. As to Reata, L.P., Reata Industrial Gas Company, and Mercado, the jury was in-

structed to base damages on lost franchise fees under Ordinance No. 1129.[55] As to Valero Transmission Company, Valero Transmission, L.P., and Valero Natural Gas Company, the jury was instructed to determine damages based on the transfer of rights, privileges or duties without the City's written consent.[56] This latter instruction pertained to the transfer of the four laterals within the City by RGVG to Valero Energy Corporation as part of a transfer of RGVG's gas transmission system.

The court of appeals concluded that "the jury charge asked the jury to assess damages based on the value of the lateral pipelines," but that "the only damages asserted in the pleadings were lost franchise fees."[57] The court of appeals then held that the City's pleadings did not give the defendants fair notice of the tortious interference claims.[58] As with its claim regarding the transfer of the laterals, the City contends that it adequately plead tortious interference. But again, in the interest of brevity, we will not address those or many of the other issues raised by the parties with respect to tortious interference because there is no merit to the substance of the tortious interference claims.

---

**55.** The instruction said:

> The loss, if any, of the contract's benefit due to the interference as measured by:
> The difference, if any, between the value of the franchise fees payable under Edinburg Ordinance No. 1129 as agreed to by Rio Grande Valley Gas Company and Southern Union Company as successor to Rio Grande Valley Gas Company with the City of Edinburg and the value of the franchise fees actually paid under Edinburg Ordinance No. 1129 as it was performed by Rio Grande Valley Gas Company and Southern Union Company as successor to Rio Grande Valley Gas Company. Do not include in your answer any amount that you find the City of Edinburg could have avoided by the exercise of reasonable care.

**56.** The instruction said:

> The loss, if any, of the contract's benefit due to the interference as measured by:
> The difference, if any, between the value to the City of Edinburg of the rights, privileges or duties sold, transferred or assigned without the express written consent of the City of Edinburg being first obtained and the amount for which the City of Edinburg could have purchased such rights, privileges or duties. Do not include in your answer any amount that you find the City of Edinburg could have avoided by the exercise of reasonable care.

**57.** 59 S.W.3d at 215–16.

**58.** *Id.* at 216.

■ With regard to the portion of the claim based on the transfer of laterals within the City by RGVG to Valero Energy Corporation, there was no evidence of any damages suffered by the City, as discussed above. With regard to the claim that sales of gas were made by affiliates of RGVG, and that the City therefore lost franchise tax revenue under Ordinance No. 1129, there was no tortious interference as a matter of law.

The companies affiliated with RGVG that sold gas to consumers in the City had the legal right to make those sales. The City had no right to expect that RGVG would be the exclusive supplier of gas to consumers within the City. As noted above, the franchise agreement embodied in Ordinance No. 1129 did not give RGVG the exclusive right to sell gas within the city limits. Nor could it lawfully have done so.[59] The City approved tariffs and enacted ordinances that implemented some of the very sales that the City now contends constituted tortious interference. The City's tortious interference claim has no merit.

## VI

■ The court of appeals held that the City failed to plead fraudulent inducement and therefore that the trial court erred in awarding punitive damages. The City takes issue with that holding. As with other claims, we will not undertake to sort through the pleadings issues because, on the merits, the City's fraud claim fails.

The jury found that RGVG committed "fraud against the City of Edinburg in connection with entering into Edinburg Ordinance No. 1129." The jury was instructed:

You are instructed that "fraud" occurs when-

a. a party makes a material misrepresentation;

b. the misrepresentation is made with knowledge of its falsity or made recklessly without any knowledge of the truth and as a positive assertion;

c. the misrepresentation is made with the intention that it should be acted on by the other party; and

d. the other party acts in reliance upon the misrepresentation and thereby suffers injury.

You are instructed that a "material misrepresentation" occurs if a promise of future performance is made without a present intent to perform as promised.

■ Ordinance No. 1129 was approved by the City in September 1985. It was not until two years later, in October 1987, that affiliates of RGVG first made sales to consumers within the City. There was no evidence that at the time the franchise agreement was reached, RGVG made any misrepresentations to the City. Nor is there any evidence that at the inception of this agreement, RGVG did not intend to perform it. As we held in *Formosa Plastics Corp. USA v. Presidio Engineers & Contractors, Inc.*, the "mere failure to perform a contract is not evidence of fraud."[60] Even were there evidence that RGVG did not fully perform material obligations under Ordinance 1129, that would not establish fraudulent inducement. The court of appeals did not err in reversing the trial court's judgment with respect to fraud in the inducement.

---

**59.** *See* TEX. CONST. ART. I, § 26 ("Perpetuities and monopolies are contrary to the genius of a free government, and shall never be allowed, nor shall the law of primogeniture or entailments ever be in force in this State.").

**60.** 960 S.W.2d 41, 48 (Tex.1998).

## VII

■ Finally, the City contends that the court of appeals erred in reversing the trial court's determination that portions of certain of the laterals transferred by RGVG to Valero Energy Corporation (and that were owned by Valero Transmission, L.P. at the time of trial) were a purpresture and an encroachment on public property. We have defined a purpresture "as an encroachment upon public rights and easements, the appropriation to private use of that which belongs to the public." [61]

The court of appeals reasoned that since the Valero entities were operated as a single business enterprise, Valero Transmission, L.P. "had the same rights to own pipelines as RGVG." [62] This analysis is incorrect for at least two reasons. First, RGVG was acquired by Southern Union in 1993. Valero Transmission, L.P.'s ownership of the laterals could not have been referable to RGVG after that date, even under the court of appeals' single business enterprise theory. Second, as we have held above, there was no basis for disregarding the distinct corporate identities of RGVG, Valero Energy Corporation, or Valero Transmission, L.P.

■ However, the court of appeals' judgment was nevertheless correct because the trial court's judgment declaring a purpresture served no purpose. Even assuming that there was a purpresture, which we do not decide, the City had abandoned any claim for damages, an injunction, or other relief regarding its contention that a purpresture existed. The facilities were constructed by RGVG under the authority given to it by the City in Ordinance No. 1129. RGVG has apparently continued to use and operate the facilities to provide gas service to consumers within the City after title was transferred to Valero Transmission, L.P. The City makes no contention that it is entitled to any relief from RGVG or Valero Transmission, L.P. as a result of the transfer of title to these facilities without the City's consent. Accordingly, we affirm the court of appeals' judgment in this regard, although we do so on grounds that differ from those asserted by the court of appeals.

* * *

Because the foregoing issues are dispositive, we do not reach a number of other issues raised, including questions regarding the proper measure of damages and proof and segregation of attorneys' fees. We affirm the court of appeals' judgment in part, reverse that judgment in part, and render judgment that the City take nothing.

Justice O'NEILL did not participate in the decision.

**61.** *Hill Farm, Inc. v. Hill County,* 436 S.W.2d 320, 321 (Tex.1969); *see also* KEETON, PROSSER AND KEETON ON THE LAW OF TORTS § 86 (5th ed.1984).

**62.** 59 S.W.3d at 225.