Opinion issued August 16, 2007

 









In The

Court of Appeals

For The

First District of Texas






NO. 01-03-01240-CV






COUNTRY VILLAGE HOMES, INC., B&A REALTY, INC., M.B.
SCHAUER HOMES, INC., SCHAUER FAMILY TRUST, and MONTE B.
SCHAUER, Appellants


V.


ROBERT E. PATTERSON and SHERRY PATTERSON, Appellees






On Appeal from the 55th District Court

Harris County, Texas

Trial Court Cause No. 2000-54409






O P I N I O N

 Appellants, Country Village Homes, Inc., B&A Realty, Inc., M.B. Schauer
Homes, Inc., Schauer Family Trust, and Monte B. Schauer (collectively Country
Village), appeal a judgment, entered in accordance with the jury's verdict, that
awarded $550,000 in damages to appellees, Robert E. and Sherry Patterson, in a
dispute over the construction of the Pattersons' house. The jury determined that the
Pattersons owed Country Village nothing for various "extras" over and above the
contract price; that the appellants, though ostensibly separate entities, acted as a
single business enterprise (the Single Business Enterprise theory); that Schauer was
responsible for the conduct of Country Village Homes, Inc. (the Alter Ego theory);
that flaws in the construction of the house breached Country Village's contract with
the Pattersons; that the cost of repair was $300,000; and, that the difference between
fair market value of the property had it been built properly and the fair market value
of the property if repaired would be $250,000. The trial court entered judgment in
favor of the Pattersons against Country Village Homes, Inc., B&A Realty, Inc., M.B.
Schauer Homes, Inc., Schauer Family Trust, and Monte B. Schauer, jointly and
severally, in the amount of $712,890.41. (1) 

 On appeal, Country Village presents five issues, asserting that:

 (1) Under article 2.21 of the Business Corporations Act, (a) any
recovery on the common law theory of Single Business Enterprise
is preempted; (b) the article's requirement of actual fraud was not
properly presented to the jury in the questions concerning the
Pattersons' Alter Ego and Single Business Enterprise theories;
and (c) the evidence is legally and factually insufficient to support
the jury's findings that the Pattersons proved their Alter Ego or
Single Business Enterprise theories;

 

 (2) Under the Residential Construction Liability Act, Country Village
made a reasonable settlement offer or there was legally and
factually insufficient evidence to prove otherwise, and the
damages available to the Pattersons were thereby limited;

 

 (3) The evidence generally was legally and factually insufficient to
support the jury's findings on liability and damages;

 

 (4) The absence of certain evidence from the appellate record
requires a new trial; and

 

 (5) Country Village's claim for "extras" was established as a matter
of law, or alternatively the jury's contrary finding was against the
great weight and preponderance of the evidence.


We conclude that Country Village only preserved its sufficiency of the evidence
arguments for our review. We hold that the evidence is legally and factually
sufficient to support the jury's findings. We affirm.

Background

 Country Village Homes, Inc., a Texas corporation owned and operated by
Schauer, built custom homes in certain subdivisions in northwest Houston. Schauer
also controlled two other Texas corporations: M.B. Schauer Homes, Inc., a building
company for other subdivisions; and B&A Realty, a land developer. Schauer was the
sole shareholder, director, and president of all three corporations. The Schauer
Family Trust was created by Schauer for the benefit of his family.

 Robert Patterson and his wife Sherry, in their search for their "dream house,"
found the Gleannloch subdivision and chose Country Village to construct their
custom home. They selected architect Kirby Fleming, whom Schauer recommended,
to design the house to their specifications. 

 The Pattersons and Country Village signed an earnest money contract in June
1999 for the purchase of the lot and the construction of the house for a total of
$719,195 to be paid on a draw schedule. The contract expressly referenced and
incorporated Fleming's plans, and provided that "[i]n the event Purchaser desires any
extras, Purchaser shall pay for said extras in advance." (2) The contract, however, does
not precisely match the plans; for example, it includes "Additional Conditions," the
first of which is "Stucco trim around windows," whereas the plans called for cast
stone around the windows. Shortly after signing the earnest money contract, the
Pattersons granted Country Village a mechanic's lien on the property.

 The Pattersons actively participated in the construction of their house. They
frequently visited the building site, and made many requests for changes in the plans. 
They requested that a first floor wall be moved to add space to the living area. They
opted for eight-foot doors instead of six-foot doors. Sherry and her interior decorator
opted for various upgrades from the original plans. Robert, who enjoyed cooking out,
asked that a "summer kitchen" be built in the backyard; later, when dissatisfied with
Country Village's efforts, the Pattersons had most of the original summer kitchen
demolished and brought in an outside company to redo that part of the project.

 In November 1999, the Pattersons asked Schauer what extras and overages they
owed on upgrades they had already selected. Schauer presented them with an invoice
totaling $11,564.96. Robert gave Schauer a check for $15,000 to cover the invoice
and the price of a refrigerator that had been ordered but that had not yet been charged
to Country Village. The Pattersons asked Schauer how much more they could expect
to pay in extras; he told them that they would not owe more than an additional
$15,000. 

 In April 2000, when preparing to close on the house, the Pattersons contacted
Schauer again about extras. On April 14, Robert drove to Schauer's office and
received a bill for extras in excess of $100,000. Distraught, Robert called Schauer,
who said that he had not yet reviewed the bill. The Pattersons did not pay this bill,
and moved into the house on April 19 or 20. 

 On April 26, Schauer came to the house to meet with the Pattersons. The
Pattersons were joined by their real estate agent and their interior decorator. After
arriving, Schauer spent nearly an hour in the backyard talking on his mobile phone. 
The real estate agent and the decorator left for other clients; after they were gone,
Schauer came inside to talk. Schauer went with Robert into Robert's office, and
presented a second bill for extras. The listed extras totaled $88,709.01; after the
deduction of certain credits, Country Village claimed that the Pattersons owed
$54,854.01. Schauer did not bring any documentation to support the individual
charges on the bill. Robert felt the second bill was "still ridiculous," and included
items for which the Pattersons had already paid outside of the boundaries of the
contract. Robert believed that many of the items were charges that had accrued
before Schauer provided the partial invoice for extras the previous December, but that
had not been included in that invoice, which Schauer at the time said included all the
charges that the Pattersons then owed. Schauer left without resolving the dispute.

 Robert instructed the lender to send the last of the draw schedule payments to
him instead of Schauer. When Schauer called requesting the last payment, Robert
asked if Schauer had signed an "All Bills Paid Affidavit," and Schauer said that he
had. Robert sent the last of the draw schedule payments to Country Village in May
2000. The affidavit in question was included in the record as plaintiff's exhibit 12;
it is notarized, and indicates that Schauer signed it on June 21, 2000.

 In the meantime, the Pattersons noticed flaws in the house. On April 28, two
days after receiving the second bill for extras, the Pattersons sent a "punch list" to
Country Village requesting that certain minor repairs be made. Country Village did
nothing regarding this list. The Pattersons paid others to get much of the repair work
done.

 The next communication the Pattersons received from Country Village was an
August 4, 2000 letter from Country Village's attorney that demanded payment for the
extras in the amount of $20,581.59. Country Village filed suit against the Pattersons
for that amount on October 23. The Pattersons hired counsel, who responded on
November 13 with a letter that noted that the items on the final punch list were not
completed as promised and added 14 additional complaints, including that their porte-cochere was collapsing. (3) On December 7, the Pattersons counter-sued Country
Village, alleging breach of contract, fraud, violations of the Deceptive Trade Practices
Act, and damages for violations of the Trust Fund Statute. On December 19, they
filed a third-party petition against Schauer, alleging that Country Village was his alter
ego. (4)

 Country Village responded with a letter dated December 29 that purported "to
make an offer of settlement pursuant to Section 27.004 of the Residential
Construction Liability Act." The letter made various offers to address most items on
the punch list--which had since been updated by the Pattersons--as well as the
additional items in the Pattersons' letter of November 13. The proposed standard of
repair was "to the reasonable satisfaction of the Pattersons," and in case of a dispute
the parties were to defer to the home warranty inspector. (5) In the letter, Country
Village required payment of one-half of the $20,581.59 for extras be paid before
repair work began, and the remainder of the charges when repairs were complete. 
The Pattersons did not respond to this letter. 

 At some point between the exchange of letters and the trial of the case, Country
Village transferred most or all of its assets to another building company belonging to
Schauer, Vintage Custom Homes. Further, Country Village transferred $100,000 as
a "consulting fee" to M.B. Schauer Homes, which was not engaged in any active
business at the time. No consulting appears to have been done; a witness at trial said
the $100,000 transfer was in fact for tax purposes.

 The case went to trial in September 2003. Country Village's live pleadings
were its first amended petition and third supplemental petition, in which it sought a
total of $31,883.09 in damages from the Pattersons, along with attorney's fees and
interest. (6) In their sixth amended consolidated counterclaim and third-party petition,
the Pattersons sought recovery against all appellants as well as Vintage Custom
Homes, raising claims of civil conspiracy, negligence, negligent misrepresentation,
common law fraud, statutory fraud under the Residential Construction Liability Act,
violations of the Deceptive Trade Practices-Consumer Protection Act, breach of
contract, breach of express and implied warranties, and declaratory relief. They did
not specifically plead a dollar amount of damages, but alleged that the defendants
should be held jointly and severally liable and the corporate veil should be pierced
under a number of theories including that each of the corporate entities and the trust
were alter egos for Schauer and each other, and that the equitable doctrine of Single
Business Enterprise should apply.

 At trial, the issues presented were whether the Pattersons owed Country Village
for extras, and whether and to what extent Country Village owed the Pattersons for
repairs. No individual extra was given any special emphasis, but the Pattersons
pointed to a number of flaws in the construction, including:

  a slope in the floor on the second story;

 

  a set of windows that did not close properly;

 

  leaks in the roof;

 

  cracks in concrete;

 

  cracks in the kitchen tile as a result of cracked concrete;

 

  tilted cast-stone pillars near the front door;

 

  a lack of "expansion joints" in the exterior brick walls; (7) and

 

  the collapsing porte-cochere.


 Country Village first called Schauer to testify. He described the nature of the
construction process, including the inspections that take place periodically while the
home is being built. He described some of the extras that the Pattersons requested. 
He stated that the problems with the house were entirely cosmetic, and that the
Patterson's proposed solutions were far too drastic. He examined arrays of photos
that had been taken over three years, explaining how these photos showed that the
problems with the house were not structural. He acknowledged that his companies
met many of the factors associated with the Pattersons' joint-and-several liability
theories, for instance keeping a single office and using one receptionist and one
accountant, as well as making interest-free loans between the companies. He also
explained that the corporate appellants were distinct entities because, for example, the
different building companies operated in different subdivisions, and because one was
not a building company at all. He said that fund transfers between the companies
were for tax purposes, and not to avoid liability in this case.

 Country Village also called a number of expert witnesses in the field of
engineering, all of whom agreed that the problems with the Pattersons' house were
largely cosmetic. They described the limited repairs that they believed were
necessary. They also said that the problems identified by the Pattersons either were
normal variations--for example, that no house is completely level--or were normal
characteristics of materials used. Inasmuch as Country Village's experts
acknowledged errors in the construction, they claimed repairs would be easy and
inexpensive, and that the Pattersons should have allowed Schauer's subcontractors
to complete the repairs.

 Country Village further called two witnesses in relation to financial issues. 
One was an appraiser, who estimated that the Pattersons' house was worth $855,000
as constructed. The appraiser further stated that whatever defects the house might
have, its market value would remain $855,000 so long as proper repairs were made. 
Another was the accountant for Schauer's businesses, who stated that Internal
Revenue Service regulations and Generally Accepted Accounting Principles permit
Schauer to have different businesses and different corporations.

 Country Village also attempted to paint the Pattersons as vindictive, and their
counterclaims as a form of revenge. For example, John Darbonne, the on-site
salesman for the Pattersons' subdivision, testified that Robert called him after
receiving the $100,000 bill. Darbonne stated that he had taken notes following the
conversation, one of which read: "He's really pissed. Will go after him in every way
he can."

 The Pattersons testified that they were the wronged parties, not Country
Village, and that the problems with the house had ruined the experience of moving
into their dream home. For example, the sloping upper floor felt like a "fun house,"
and people who sat on the upstairs commode felt like they would slip off. They
averred that, contrary to the statements of Country Village's experts, the slope in the
upper floor was getting worse over time. Although they admitted to ordering a
number of extras, and stated that they wanted to pay what they owed, they presented
a number of reasons why the various amounts that Country Village asked them to pay
were unreasonable. They contended that Country Village's settlement offer of
December 29, 2000 was unreasonable because it required them to pay money that was
in dispute in order to have repairs made, when the need for some of those repairs was
not in dispute. They stated that Schauer repeatedly told them that any extras after
they wrote a $15,000 check in December 1999 would cost no more than a further
$15,000. They said, overall, that they felt that they had been taken advantage of in
pursuit of their dream house.

 The Pattersons also presented expert witnesses who testified regarding the
extent of the damages alleged. Their structural engineer stated that the second floor
was sagging because of an undersized beam or beams, and the framing of the second
floor would need to be entirely replaced. This, he said, would require a replacement
roof. The porte-cochere would require extensive repair, and the cracks in the
concrete would need to be filled. The engineer estimated that repairs would cost
approximately $300,000. The CEO of the company that the Pattersons hoped to hire
to repair the house testified that, based on the engineer's report, the repairs would
cost in excess of $350,000, and no lesser repairs would be effective.

 The Pattersons' financial expert cast doubt on the charges sought by Country
Village, testifying that he had "extreme difficulty in satisfying myself" as to the
validity of a variety of line items included in Country Village's demand letter. He
stated that even giving the benefit of the doubt to Country Village on the questionable
items, he estimated that the Pattersons had overpaid Country Village, and were
entitled to a refund. (8) He also testified that the conduct of Country Village and the
other defendants satisfied the Single Business Enterprise and Alter Ego theories.

 The Pattersons' real estate appraiser testified that the market value of the
house, had it been properly constructed, would have been approximately $885,000. 
The appraiser also explained the theory of "stigma," under which it is possible to
estimate the reduction in market value of a home due to the reluctance of buyers to
purchase a house that has undergone extensive repairs. He explained the methods by
which he applied this theory, and stated that he estimated the value of the Pattersons'
house--if it were repaired as the Pattersons' engineer recommended--would be
approximately $575,000, a difference of $310,000.

 By a vote of 10-2, the jury found that:

  Country Village did not install any extras or perform any work
installing extras for which it had not been compensated; 

 

  Country Village's section 27.004 settlement letter was not a
reasonable offer; 


  Country Village failed to substantially comply with the contract,
and that the failure was a "producing cause" of damage to the
Pattersons; 

 

  reasonable repair damages were $300,000, and reasonable stigma
damages were $250,000; and

 

  all appellants acted as a Single Business Enterprise, and Schauer
was responsible for the conduct of Country Village Homes, Inc. 


Country Village filed a motion for judgment notwithstanding the verdict. The
Pattersons filed a motion to sever Vintage Custom Homes from the case. The trial 
court severed Vintage Custom Homes, and entered judgment on the verdict against
the remaining defendants, awarding damages and pre- and postjudgment interest. 
Country Village then filed a motion for new trial that the trial court denied.

 Country Village timely filed a notice of appeal and properly paid for the
reporter's record in this case. However, the reporter's record was not filed until after
we held the court reporter in contempt of court. The record remains incomplete. At
our request, the trial court entered findings of fact and conclusions of law regarding
the incomplete reporter's record.

General Standards of Review

 In four of its five issues on appeal, Country Village contends that the evidence
is legally and factually insufficient to support most of the jury's findings. In their
response, the Pattersons contend that various of Country Village's issues and sub-issues are objections to the jury charge that have not been preserved for our review. 
We must apply different standards of review for these two arguments.

 A. Sufficiency of the Evidence

 In reviewing the trial court's verdict for legal sufficiency, we credit evidence
that supports the verdict if reasonable jurors could, and disregard contrary evidence
unless reasonable jurors could not. City of Keller v. Wilson, 168 S.W.3d 802, 827
(Tex. 2005). A challenge to the legal sufficiency of evidence will be sustained when,
among other things, the evidence offered to establish a vital fact does not exceed a
scintilla. Id. at 810. Evidence does not exceed a scintilla if it does no more than
create a mere surmise or suspicion that the fact exists. Ford Motor Co. v. Ridgway,
135 S.W.3d 598, 601 (Tex. 2004).

 In determining the factual sufficiency of the evidence to support a jury's
finding, courts of appeals are to weigh all the evidence, both for and against the
finding. Dow Chem. Co. v. Francis, 46 S.W.3d 237, 242 (Tex. 2001). In reviewing
a factual sufficiency challenge to a finding where the burden of proof is not on the
complaining party, we set aside the verdict only if the evidence in support of the
finding is so weak as to render the verdict clearly wrong and manifestly unjust. Cain
v. Bain, 709 S.W.2d 175, 176 (Tex. 1986). In reviewing a factual sufficiency
challenge to a finding where the burden of proof is on the complaining party, that
party must show that "the adverse finding is against the great weight and
preponderance of the evidence." Dow Chem., 46 S.W.3d at 242. In conducting our
review, we may not substitute our judgment for that of the jury, which is the sole
judge of the credibility of witnesses and the weight to be given to their testimony.
Golden Eagle Archery, Inc. v. Jackson, 116 S.W.3d 757, 761 (Tex. 2003).

 B. Preservation of Objections to the Jury Charge

 "Any complaint as to a question, definition, or instruction, on account of any
defect, omission, or fault in pleading, is waived unless specifically included in the
objections." Tex. R. Civ. P. 274. To be sufficiently specific, the party's objection
must identify the claimed error and explain the basis of the party's complaint. Tex.
R. Civ. P. 274; Castleberry v. Branscum, 721 S.W.2d 270, 276 (Tex. 1986). A
sufficiently specific objection enables the trial court to understand the party's precise
grounds and to rule. Castleberry, 721 S.W.2d at 276. 

 We determine whether a party has preserved error in the jury charge by
inquiring whether a party has (1) presented to the trial court a timely request, motion,
or objection, (2) stated the specific ground, and (3) obtained a ruling. Tex. R. App. P.
33.1(a); see In re B.L.D., 113 S.W.3d 340, 349 (Tex. 2003); State Dep't of Highways
& Pub. Transp. v. Payne, 838 S.W.2d 235, 241 (Tex. 1992); see also Miga v. Jensen,
96 S.W.3d 207, 212-13 (Tex. 2002) (upholding preservation based on Payne); Alaniz
v. Jones & Neuse, Inc., 907 S.W.2d 450, 451-52 (Tex. 1995) (noting that Payne did
not revise preservation requirements of rules of civil procedure regarding jury charge,
but did mandate that those requirements be applied in common sense manner that
serves, rather than defeats, rules of procedure). Further, a party must present its
objections to the charge (1) to the trial court, either in writing or by dictating them to
the court reporter, (2) in the presence of the court and opposing counsel, and (3)
before the charge is read to the jury. Tex. R. Civ. P. 272. An objection not presented
to the trial court during this time is waived. Id. Specifically, for the trial court "to
resolve a legal issue before the jury could properly perform its fact-finding role[,] . . .
a party must lodge an objection in time for the trial court to make an appropriate
ruling without having to order a new trial." Osterberg v. Peca, 12 S.W.3d 31, 55
(Tex. 2000) (quoting Holland v. Wal-Mart Stores, Inc., 1 S.W.3d 91, 94 (Tex. 1999)).

Piercing the Corporate Veil

 In its first issue, Country Village complains that the Single Business Enterprise
and Alter Ego theories--presented to the jury in questions nine and ten--are
unsupported by Texas law or by legally or factually sufficient evidence. Specifically,
Country Village asserts that:

  the Single Business Enterprise and Alter Ego theories are contrary
to and pre-empted by article 2.21 of the Business Corporation
Act, Tex. Bus. Corp. Act Ann. art. 2.21 (Vernon 2003);


  the jury did not find "actual fraud" as required by article 2.21, id.
art. 2.21(A)(2);

 

  if the jury found "actual fraud," that finding is not supported by
legally or factually sufficient evidence; and

 

  the jury's findings on the remaining elements of the Single
Business Enterprise and Alter Ego theories are not supported by
legally or factually sufficient evidence.


The theories of Single Business Enterprise and Alter Ego are both methods to
disregard the corporate fiction. Aluminum Chem. (Bolivia) Inc. v. Bechtel Corp., 28
S.W.3d 64, 68 (Tex. App.--Texarkana 2000, no pet.). They create a means of
imposing liability where none would otherwise exist. Id. The two theories are
separate and distinct, id., and the trial court presented separate questions on each
theory.

 A. Single Business Enterprise

 The Single Business Enterprise theory is an equitable doctrine used to
disregard separate corporate identities when multiple corporations do not operate
separately, but instead integrate their resources to achieve a common business
purpose. Hoffmann v. Dandurand, 180 S.W.3d 340, 347-48 (Tex. App.--Dallas
2005, no pet.); Old Republic Ins. Co. v. Ex-Im Servs. Corp., 920 S.W.2d 393, 395-96
(Tex. App.--Houston [1st Dist.] 1996, no writ). Its viability in Texas, however, is
not clear. The supreme court has expressly declined to decide whether the Single
Business Enterprise theory is "a necessary addition to Texas law regarding the theory
of alter ego for disregarding corporate structure." S. Union Co. v. City of Edinburg,
129 S.W.3d 74, 87 (Tex. 2003). Many courts of appeals continue to apply the theory,
including in cases decided after the supreme court issued its opinion in Southern
Union. See Formosa Plastics Corp., USA v. Kajima Int'l, Inc., 216 S.W.3d 436, 460
(Tex. App.--Corpus Christi 2006, pet. filed) (applying Single Business Enterprise
theory after Southern Union); Nat'l Plan Adm'rs, Inc. v. Nat'l Health Ins. Co., 150
S.W.3d 718, 744 (Tex. App.--Austin 2004, pet. granted) (same); In re U-Haul Int'l,
Inc., 87 S.W.3d 653, 657 (Tex. App.--San Antonio 2002, orig. proceeding) (applying
theory pre-Southern Union); Hall v. Timmons, 987 S.W.2d 248, 255 (Tex.
App.--Beaumont 1999, no pet.) (same); Old Republic, 920 S.W.2d at 395-96 (same);
see also Hoffmann, 180 S.W.3d at 348 (recognizing theory's validity after Southern
Union, but concluding that facts of case did not fit theory); Carlson Mfg., Inc. v.
Smith, 179 S.W.3d 688, 693-94 (Tex. App.--Beaumont 2005, no pet.) (same). The
Texarkana court of appeals, however, has emphasized that in cases founded in
contract, article 2.21 controls all veil-piercing claims, and thus the "actual fraud"
requirements of that statute apply. See Texas-Ohio Gas, Inc. v. Mecom, 28 S.W.3d
129, 137-38 (Tex. App.--Texarkana 2000, no pet.).

 Factors commonly considered in determining whether corporations operate as
a single business enterprise include, but are not limited to, the following: (1) common
employees, (2) common offices, (3) centralized accounting, (4) payment of wages by
one corporation to another corporation's employees, (5) common business name, (6)
services rendered by the employees of one corporation on behalf of another
corporation, (7) undocumented transfers of funds between corporations, and (8)
unclear allocation of profits and losses between corporations. See Nat'l Plan Adm'rs,
150 S.W.3d at 745. However, the supreme court in Southern Union stated that
findings of common directors, shared employees, and central accounting and payroll
systems "do not justify disregarding the corporate structures of affiliated companies." 
129 S.W.3d at 89.

 In the present case, in question nine, the jury was asked:

 On the occasion in question, were any two or more of the following
entities acting together as a single-business enterprise: Monte B.
Schauer, Vintage Homes, Inc., M.B. Schauer Homes, Inc., B&A Realty,
the Schauer Family Trust, and Country Village Homes, Inc.?

 

 Two or more corporations, entities or individuals are
operating as a single business enterprise if they are not
operated as separate entities, but rather integrate their
resources to achieve a common business purpose.


The trial court then listed the factors as enumerated in National Plan Administrators. 
See 150 S.W.3d at 745. The jury answered yes as to each of the appellants. Country
Village did not object to the form or content of this question. 


 B. Alter Ego

 Generally, a corporation exists as a separate legal entity, insulating its
shareholders from personal liability. Hoffman, 180 S.W.3d at 347. The Alter Ego
theory applies when there is such a unity between corporation and individual that the
corporation has ceased to be a separate entity, and allowing the individual to avoid
liability through the use of the corporate form would work an injustice. See id. (citing
Mancorp, Inc. v. Culpepper, 802 S.W.2d 226, 228 (Tex. 1990)). Evidence relevant
to prove an Alter Ego theory includes: (1) payment of alleged corporate debts with
personal checks or other commingling of funds, (2) representations that the individual
will financially back the corporation, (3) diversion of company profits for the
individual's personal use, (4) inadequate capitalization, and (5) other failures to keep
corporate and personal assets separate. Id. (citing, inter alia, Mancorp, 802 S.W.2d
at 229.) Failure to comply with corporate formalities is no longer a factor in
considering whether Alter Ego exists. Id.; see also Tex. Bus. Corp. Act Ann. art.
2.21 § A(3) (Vernon 2003). A showing that an individual is an officer, director, or
majority shareholder is insufficient to support a finding of Alter Ego. Hoffman, 180
S.W.3d at 347. 

 In question ten, the jury was asked:

 Is Monte B. Schauer responsible for the conduct of Country Village
Homes, Inc.?

 

 Monte B. Schauer is "responsible" for the conduct of Country Village
Homes, Inc., if: 


 Country Village Homes, Inc., was organized and operated as a
mere tool or business conduit of Monte B. Schauer, there was such unity
between Country Village Homes, Inc., and Monte B. Schauer that the
separateness of Country Village Homes, Inc., had ceased and holding
only Country Village Homes, Inc., responsible would result in injustice;
and Monte B. Schauer caused Country Village Homes, Inc., to be used
for the purpose of perpetuating and did perpetuate an actual fraud on
Robert and Sherry Patterson primarily for the direct personal benefit of
Monte B. Schauer.

 

 In deciding whether there was such unity between Country
Village Homes, Inc., and Monte B. Schauer that the separateness of
Country Village Homes, Inc., had ceased, you are to consider the total
dealings of Country Village Homes, Inc., and Monte B. Schauer,
including:

 

 1. the degree to which Country Village Homes, Inc.'s
property had been kept separate from that of Monte
B. Schauer;

 

 2. the amount of financial interest, ownership, and
control Monte B. Schauer maintained over Country
Village Homes, Inc.; and

 

 3. whether Country Village Homes, Inc., had been used
for personal purposes of Monte B. Schauer.

 

 "Actual fraud" means actions involving dishonesty of purpose or
intent to deceive.


Country Village did not object to the form or content of this question. The jury
answered yes.


 C. The Business Corporation Act and Southern Union (9)

 Country Village asserts that article 2.21 of the Business Corporation Act is the
exclusive manner for piercing the corporate veil. The article states, in relevant part:

 A. A holder of shares, an owner of any beneficial interest in shares,
or a subscriber for shares whose subscription has been accepted, or any
affiliate thereof or of the corporation, shall be under no obligation to the
corporation or to its obligees with respect to:

 

 . . .

 

 (2) any contractual obligation of the corporation or any matter
relating to or arising from the obligation on the basis that the
holder, owner, subscriber, or affiliate is or was the alter ego of the
corporation, or on the basis of actual fraud or constructive fraud,
a sham to perpetrate a fraud, or other similar theory, unless the
obligee demonstrates that the holder, owner, subscriber, or
affiliate caused the corporation to be used for the purpose of
perpetrating and did perpetrate an actual fraud on the obligee
primarily for the direct personal benefit of the holder, owner,
subscriber, or affiliate; 

 

 . . .

 

 B. The liability of a holder, owner, or subscriber of shares of a
corporation or any affiliate thereof or of the corporation for an
obligation that is limited by Section A of this article is exclusive and
preempts any other liability imposed on a holder, owner, or subscriber
of shares of a corporation or any affiliate thereof or of the corporation
for that obligation under common law or otherwise, except that nothing
contained in this article shall limit the obligation of a holder, owner,
subscriber, or affiliate to an obligee of the corporation when:


 . . .


 (2) the holder, owner, subscriber, or affiliate is otherwise liable to the
obligee for the obligation under this Act or another applicable
statute.


Tex. Bus. Corp. Act Ann. art. 2.21 (emphasis added). (10)

 In Southern Union, the supreme court held that an assertion of the common law
Single Business Enterprise theory failed when there was insufficient evidence of
"actual fraud" as required by article 2.21 and the jury charge. 129 S.W.3d at 88. The
City of Edinburg had entered into a contract embodied in city ordinances with a
natural gas supplier. Id. at 75-76. The supplier agreed to pay a 4% franchise tax. Id.
at 76. The issue before the supreme court was whether several companies affiliated
with the supplier were subject to the tax based on a Single Business Enterprise theory. 
Id. The supreme court held that the affiliated companies were not subject to the tax. 
Id.

 In reviewing the jury's affirmative finding on a Single Business Enterprise
question, the court noted that it had never considered the theory "in any detail." Id.
at 86. The court declined to "decide . . . whether a theory of 'single business
enterprise' is a necessary addition to Texas law regarding the theory of alter ego for
disregarding corporate structure and the theories of joint venture, joint enterprise, or
partnership for imposing joint and several liability." Id. at 87. The supreme court 
held that whatever label is applied to a veil-piercing theory, article 2.21 of the Texas
Business Corporation Act controls. Id. The court concluded that the City's attempt
to treat the supplier and the affiliated companies as a single business enterprise failed
because no evidence supported a finding of "actual fraud." Id. at 88; see also Tex.
Bus. Corp. Act Ann. art. 2.21 (Vernon 2002). Specifically, the supreme court held
that there was no evidence of "conduct involving dishonesty of purpose or intent to
deceive" as required by the jury charge's definition of "actual fraud." S. Union, 129
S.W.3d at 88.

 Because the supreme court has held that article 2.21 controls veil-piercing
claims, we conclude that a finding of actual fraud is required in order to prove a
theory of Single Business Enterprise. See Tex. Bus. Corp. Act Ann. art. 2.21 cmt.
1996; S. Union, 129 S.W.3d at 87. 

 D. Omissions from the Charge

 Question nine of the jury charge, concerning single business enterprise, did not
mention fraud at all, and question ten, regarding alter ego, defined actual fraud as
"actions involving dishonesty of purpose or intent to deceive." We must determine,
therefore, the consequences of the failure by Country Village to object to the jury
charge or to make the trial court aware of its contentions that article 2.21 controls
theories by which the corporate veil may be pierced, that Single Business Enterprise
is not a valid theory under Texas law, and that if it is recognized as a theory then it
requires a finding of actual fraud. See State Dep't of Highways & Pub. Transp. v.
Payne, 838 S.W.2d 235, 241 (Tex. 1992). 

 The Pattersons assert that their Single Business Enterprise theory was not
challenged by any trial objection, charge objection, or motion. They further state that
no question or instruction was submitted by Country Village with respect to "actual
fraud," and if it is in fact a missing element of the Pattersons' Single Business
Enterprise theory, then it should be deemed found by the trial court. See Tex. R. Civ.
P. 279.

 Nothing in the record indicates that Country Village ever made the trial court
aware of its contentions relating to article 2.21 and actual fraud. Country Village
asserts that it was not required to object because objection is not required to preserve
error on an omitted independent ground of recovery, and its theory on appeal is that
the Pattersons were required, but failed, to submit common law fraud as a separate
and independent ground of recovery in order to pierce the corporate veil. (11) 

 In a charge conference on the record, Country Village's trial counsel objected
to questions six through ten, asserting that there was no evidence or insufficient
evidence to support the submission of the issues and that any answer of yes would be
against the great weight and preponderance of the evidence. The trial court overruled
these objections. The clerk's record contains a Trial Preparation Order submitted by
Country Village, which includes proposed jury questions that do not address any of
the Pattersons' veil-piercing theories. (12) Country Village's motion for new trial and
for judgment notwithstanding the verdict challenge only the legal and factual
sufficiency of the evidence to support the jury's findings. Country Village never
presented the trial court with its contentions regarding article 2.21 and actual fraud.
Thus, Country Village did not preserve any error in the jury charge for our review. 
See Tex. R. App. P. 33.1(a); Tex. R. Civ. P. 272, 274; Payne, 838 S.W.2d at 241. 

 Generally, when a complaining party has not alerted the trial court of an
alleged defect by objecting to the court's charge, it is the charge, and not some other,
unidentified law, against which we measure sufficiency of the evidence. Osterberg
v. Peca, 12 S.W.3d 31, 55 (Tex. 2000). When a party fails to bring controlling law
to the attention of the trial court, as Country Village failed to do here with its
arguments regarding article 2.21, that party waives on appeal any argument regarding
that other law. See Equistar Chem., L.P. v. Dresser-Rand Co., No. 04-0121, 2007
WL 1299161 at *3 (Tex. May 4, 2007) (argument that charge submitted improper
measure of damages was waived by failure to present to trial court); Gen. Chem.
Corp. v. De La Lastra, 852 S.W.2d 916, 920 (Tex. 1993) (failure to object to jury
questions based on state law waived assertion on appeal that federal maritime law
controlled). Furthermore, a broad objection to sufficiency of the evidence, as Country
Village asserted below in its motions for judgment notwithstanding the verdict and
for a new trial, is generally insufficient to "clearly and distinctly make the trial court
aware of a contention" even if that contention is "necessarily encompassed" in the
evidentiary objections. See Equistar Chem., 2007 WL 1299161, at *4.

 However, where the claimed error in the charge is the omission of an element
of a theory of recovery, rule 279 of the Rules of Civil Procedure "prescribes the
consequences for failing to object to that omission." In re. J.F.C., 96 S.W.3d 256,
262 (Tex. 2002) (applying rule 279 to omission of "best interests of the child" from
charge in termination of parental rights case); see also Tex. R. Civ. P. 279. If an
entire independent ground of recovery is omitted, that ground of recovery is waived. 
See Tex. R. Civ. P. 279; Ramos v. Frito-Lay, Inc., 784 S.W.2d 667, 668 (Tex. 1990). 
If a submitted ground of recovery consists of more than one element, and at least one
element is submitted to and found by the jury, the parties are considered to have
agreed to waive a jury trial on the elements that were not submitted, and to have
submitted those issues to the trial court for resolution. In re. J.F.C., 96 S.W.3d at
262-63; First State Bank, Morton v. Chesshir, 634 S.W.2d 742, 747 (Tex.
App.--Amarillo 1982, writ ref'd n.r.e.). If the trial court does not make written
findings on the omitted elements, the court of appeals will deem the omitted elements
found in support of the judgment. In re. J.F.C., 96 S.W.3d at 262-63; Gulf States
Utils. Co. v. Low, 79 S.W.3d 561, 565 (Tex. 2002).

 Even though we have held above that Country Village's assertions of charge
error were not preserved, we still must address Country Village's assertion that actual
fraud is not an omitted element of the Patterson's veil-piercing theories, but instead
is a required independent ground of recovery. If actual fraud was an omitted element,
then because some essential elements of the Pattersons' theories were presented to the
jury without an objection pointing out the omission of actual fraud from question
nine, we would deem that omitted element found in support of the judgment so long
as there is sufficient evidence to support such a finding. See Tex. R. Civ. P. 279;
Ramos, 784 S.W.2d at 668; Bencon Mgmt. & Gen. Contracting, Inc. v. Boyer, Inc.,
178 S.W.3d 198, 205 (Tex. App.--Houston [14th Dist.] 2005, no pet.). Country
Village contends, however, that article 2.21 requires submission of common law
fraud as an independent ground of recovery, and that such an independent ground is
waived because no element thereof was submitted to the jury. See Tex. R. Civ. P.
279. If this contention is correct, then both of the Pattersons' veil-piercing theories
would fail as a matter of law, because no evidence would support either the jury's
finding of fraud under question ten or a deemed finding of fraud under question nine
when the Pattersons had not obtained a separate jury finding on common law fraud.

 In its briefs to this Court, Country Village cites to a number of cases in which
a separate question on fraud was presented to the jury, but none of those cases holds
that a separate question on fraud was required to be presented to the jury. For
example, in a supplemental letter brief to this court, Country Village quotes Southern
Union as stating that "[f]irst, the City used the single business enterprise finding to
underpin its breach of contract claim. There was no tort claim to which the single
business enterprise finding could have applied other than the fraud in the inducement
claim[.]" S. Union, 129 S.W.3d at 88. This quotation, taken in context, does not
relate to the necessity of a separate question on fraud; instead, the supreme court was
correcting the court of appeals' statement that "[t]o prove that there has been a sham
to perpetuate a fraud, tort claimants must only show constructive fraud." Id. (quoting
Rio Grande Valley Gas Co. v. City of Edinburg, 59 S.W.3d 199, 209 (Tex.
App.--Corpus Christi 2003)) (emphasis added by supreme court). The supreme court
was stating that a finding of actual fraud under article 2.21 was necessary because the
City of Edinburg's claim sounded in contract, and veil-piercing in contract actions is
governed by article 2.21. See S. Union, 129 S.W.3d at 88. The supreme court did not
hold and has not held that a separate question and finding on common law fraud is
a necessary underpinning of a veil-piercing action. 

 Finally, before we evaluate the sufficiency of the evidence to support the
verdict and judgment, we must determine whether we are required only to measure
the evidence against the charge as given, see Osterberg, 12 S.W.3d at 55, or whether
we must review the sufficiency of the evidence to support a deemed trial court finding
of actual fraud. See Tex. R. Civ. P. 279; In re. J.F.C., 96 S.W.3d at 262-63. 
Generally, if a party fails to bring controlling law to the attention of the trial court,
that party waives for the purposes of appeal any argument that other law should
govern the charge. Equistar Chem., 2007 WL 1299161, at *3; Gen. Chem. Corp, 852
S.W.2d at 920. More specifically, the Austin Court of Appeals has held that when an
article 2.21 complaint is not asserted before the trial court, rule 274 and Osterberg
require that the sufficiency of the evidence be measured against the trial court charge
that was submitted to the jury. See Nat'l Plan Adm'rs, 150 S.W.3d at 745; see also
Equistar Chem., 2007 WL 1299161, at *3 (quoting Tex. R. Civ. P. 274) ("Any
complaint as to a question, definition, or instruction, on account of any defect,
omission, or fault in pleading, is waived unless specifically included in the
objections."). Accordingly, because Country Village presented the trial court only
with challenges to the legal and factual sufficiency of the evidence to support the
Pattersons' Single Business Enterprise and Alter Ego theories, and not with a
challenge that article 2.21 controls the proper submission of those theories, we will
review the record only for legally and factually sufficient evidence in support of the
jury's finding on the law as presented in the charge. See Tex. R. Civ. P. 274;
Equistar Chem., 2007 WL 1299161, at *4; Osterberg v. Peca, 12 S.W.3d at 55. 

 E. Sufficiency of the Evidence

 Because Country Village failed to preserve its legal contentions for our review,
our consideration of its first issue on appeal is limited to the legal and factual
sufficiency of the evidence to support the jury's answers to questions nine and ten as
presented in the charge. (13)

 1. Country Village's Contentions

 Country Village asserts that there was no evidence or insufficient evidence of
dishonesty or intent to deceive as required by the definition of "actual fraud" that was
submitted to the jury. Country Village states that there is nothing dishonest or
deceitful about a corporate defendant ceasing operations during the pendency of a
lawsuit, as Country Village Homes, Inc., did here. It further asserts that there is
nothing fraudulent about having a negative net worth, nor does a negative net worth
render a corporate defendant judgment-proof as the Pattersons' expert testified. 
Country Village also contends that all of the evidence of fraud emphasized by the
Pattersons is of events that took place after the events giving rise to the present cause
of action, such as the payment of the consulting fee and the shutting down of Country
Village Homes, Inc. in favor of Vintage Custom Homes.

 Finally, Country Village contends that to prove actual fraud, the Pattersons
were required to show that the fraud was perpetrated for the direct personal benefit
of Schauer. Country Village argues that even though Schauer was the sole
stockholder of Country Village Homes, Inc., a judgment against Country Village
Homes, Inc., would affect Schauer only indirectly.

 2. The Pattersons' Response

 The Pattersons respond that Schauer's shifting of assets between his various
corporations to shield those assets from litigation tends to show dishonesty and deceit
on the part of Schauer and the entities he controls. They point to Robert's testimony
that Schauer had a pattern of seeking excessive overages, and that Schauer had been
sued for similar behavior. The Pattersons also point to the testimony of Schauer's
employee, who said that Schauer had a history of charging expenses from one house
to another house, and paying personal expenses from corporate accounts. Finally, the
Pattersons summarize the testimony of their expert to support the jury's answers to
questions nine and ten.

 3. Single Business Enterprise as Presented in the Jury Charge 

 Having reviewed the entire record, we conclude that there is some evidence in
support of the jury's finding that the Pattersons proved their Single Business
Enterprise theory and that the evidence is not so weak as to render the verdict clearly
wrong or manifestly unjust. See id. Regarding question nine, Kenneth Miller, the
Pattersons' expert, and Schauer himself each gave a point-by-point analysis of the
business practices of the corporate appellants. Schauer admitted, and Miller agreed,
that the companies shared common employees, offices, and an accounting firm, that
one corporation paid another corporation's employees, and that employees of one
corporation rendered services on behalf of another corporation. (14) Furthermore, Betty
Morgan testified that she was a common employee for Country Village and Vintage
Custom Homes, both Schauer corporations, that she worked out of a common office,
and that she did work for Vintage while being paid by Country Village. (15)

 Schauer and his accountant disagreed with Miller regarding undocumented
transfers of funds or unclear allocations of profits and losses. Schauer and the
accountant maintained that the transfers of funds were documented by cancelled
checks, and that the allocations of profits and losses were clear from the companies'
separate accounting ledgers. Miller contended that checks were insufficient
documentation for the transfers between corporations. Specifically, he identified
interest-free loans not evidenced by a borrowing agreement, but only by a check with
"loan" in the memorandum field. He also stated that transfers for "consulting fees"
were unclear allocations of profits and losses. Further relating to the final two
factors, Morgan testified that she transferred funds from a project of one corporation
to a project of another corporation. We conclude that this evidence supports the jury's
finding in its answer to question nine that Country Village and its sibling corporations
were "not operated as separate entities, but rather integrate[d] their resources to
achieve a common business purpose." See generally Nat'l Plan Adm'rs., 150 S.W.3d
at 746-47. We also conclude that, viewed neutrally, the evidence is not so weak as
to render the verdict clearly wrong or manifestly unjust. See Cain v. Bain, 709
S.W.2d 175, 176 (Tex. 1986). We hold that the Pattersons' evidence is both legally
and factually sufficient to prove its Single Business Enterprise theory as the theory
was presented in the jury charge.

 4. Actual Fraud as Presented to the Jury

 Our review of the evidence is limited to the jury's consideration of actual fraud
as it was presented in jury question ten on Alter Ego: that "Schauer caused Country
Village Homes, Inc., to be used for the purpose of perpetrating and did perpetrate an
actual fraud . . . . 'Actual fraud' means actions involving dishonesty of purpose or
intent to deceive." See Tex. Bus. Corp. Act Ann. art. 2.21 § A(2) and cmt. 1996. 

 The Pattersons presented evidence that Schauer caused Country Village to be
used for actions involving dishonesty of purpose or intent to deceive. Specifically,
Schauer, acting for his company, deceived the Pattersons about the amount that they
would be charged for extras. The record shows that the Pattersons sought updates
from Schauer and Country Village on the status of the extras. Evidence also shows
that at the time Schauer received a $15,000 check from the Pattersons in November
1999, he told them that in addition to that check they would owe no more than an
additional $15,000 for extras. Evidence further establishes that when Schauer made
that representation, Country Village was already in possession of invoices that it
would use to assert a claim for more than $15,000 from the Pattersons for extras.

 Generally, a prediction of the future will not be held to be fraudulent. Bryant
v. Transcont'l Gas Pipe Line Co., 821 S.W.2d 187, 190 (Tex. App.--Houston [14th
Dist.] 1991, writ denied). However, a statement about the future that was made with
present knowledge that the statement must be false can support a finding of fraud. 
See Dowling v. NADW Mktg., Inc., 631 S.W.2d 726, 728 (Tex. 1982) (advertisement
for "buy back agreement" where defendant had no present intent to perform under
buy-back agreement supported cause of action for fraud); Stanfield v. O'Boyle, 462
S.W.2d 270, 270, 272 (Tex. 1971) (promise to convey real estate combined with
evidence of intent not to perform sufficient to support cause of action for fraud);
Texaco, Inc. v. Phan, 137 S.W.3d 763, 769 n.3 (Tex. App.--Houston [1st Dist.] 2004,
no pet.). The Pattersons presented evidence that Schauer, as a representative of
Country Village, made a representation about the future, and that he had present
knowledge that the statement must be false.

 In addition, the Pattersons' evidence of Schauer and Country Village
attempting to collect a variety of unsupported charges for extras is evidence that
supports the jury's determination that Schauer acted with dishonesty of purpose or
intent to deceive. Because Country Village's charges for extras varied by more than
$50,000, and because Schauer refused until the eve of trial to provide the Pattersons
with any foundation for these charges, it can be reasonably inferred that the earlier,
higher charges were deceptive.

 Furthermore, having reviewed the entire record, we conclude that evidence is
sufficient to establish that Schauer acted with the mental state required by the jury
charge: dishonesty of purpose or intent to deceive. While a party's intent is
determined at the time the party made an alleged misrepresentation, intent may be
inferred from the party's actions after the statement is made. Spoljaric v. Percival
Tours, Inc., 708 S.W.2d 432, 434 (Tex. 1986); W & F Transp., Inc. v. Wilhelm, 208
S.W.3d 32, 48 (Tex. App.--Houston [14th Dist.] 2006, no pet.); Frost Nat'l Bank v.
Heafner, 12 S.W.3d 104, 112 (Tex. App.--Houston [1st Dist.] 1999, pet. denied). 
Because intent to defraud is not normally susceptible to direct proof, it usually must
be proven by circumstantial evidence. Spoljaric, 708 S.W.2d at 435; Heafner, 12
S.W.3d at 112. "Slight circumstantial evidence" of fraud, when considered with the
breach of a promise to perform, is sufficient to support a finding of intent to defraud. 
Spoljaric, 708 S.W.2d at 435; Heafner, 12 S.W.3d at 112.

 Here, an inference of fraudulent intent is supported by the Patterson's evidence
of various manipulations of the corporate assets of Schauer's enterprises, of his
refusal to provide the Pattersons with documentation to support his claimed charges
for extras, and of Robert's testimony that Schauer made a practice of seeking payment
for extras far above that which would be justified. Though all occurring after the
alleged misrepresentations, this evidence supports an inference that Schauer had the
requisite dishonesty of purpose or fraudulent intent at the time the Pattersons
contracted with his corporation, Country Village Homes, Inc. Assuming, without
deciding, that Country Village is correct that no single piece of the Pattersons'
evidence alone supports a finding of actual fraud, we conclude that, taken together,
the Pattersons have presented some evidence of actions involving dishonesty of
purpose or intent to deceive, and that the evidence is not so weak as to render the
jury's verdict clearly wrong or manifestly unjust. See Cain, 709 S.W.2d at 176. We
hold that the evidence is legally and factually sufficient to support the jury's finding
of actual fraud as presented in jury question ten.

 5. Personal Benefit

 Under question ten, the actual fraud also must have been perpetrated for
Schauer's direct personal benefit. Having reviewed the entire record, we conclude
that legally and factually sufficient evidence establishes that Country Village Homes
was used to perpetrate an actual fraud for the personal benefit of Schauer. Schauer,
Morgan, and Schauer's accountant all testified that Schauer would pay for personal
items such as utility bills and car payments out of his companies' accounts. Schauer
was not merely benefitting as a shareholder, as Country Village contends. Instead,
he was using Country Village's corporate assets as his own and treating the company
as his alter ego, and therefore a fraud for the benefit of Country Village would
likewise benefit Schauer. 

 F. Conclusion

 We conclude that there is more than a scintilla of evidence to support the jury's
finding in favor of the Pattersons on their theories of Single Business Enterprise and
Alter Ego. See City of Keller v. Wilson, 168 S.W.3d 802, 827 (Tex. 2005). We
further conclude that the evidence in support of the jury's findings is not so weak as
to render the verdict clearly wrong or manifestly unjust. See Cain, 709 S.W.2d at
176. We therefore hold that the evidence is legally and factually sufficient to support
the trial court's assignment of joint and several liability against Schauer, B&A Realty,
Inc., M.B. Schauer Homes, Inc., and the Schauer Family Trust.

 We overrule Country Village's first issue.

Settlement Offer

 In its second issue, Country Village contends that it made a reasonable
settlement offer in accordance with the Residential Construction Liability Act (the
Act). See Act of May 24, 1999, 76th Leg., R.S, ch. 189, 1999 Tex. Sess. Law Serv.
663 (current version at Tex. Prop. Code Ann. §§ 27.001-.003, 27.004, 27.0042,
27.002 (Vernon Supp. 2006) and §§ 27.0031, 27.0041, 27.005-.006 (Vernon
2000)). (16) It states that by complying with the statute, it is entitled to certain
limitations on liability.

 The Act in force at the time this action accrued stated, in relevant part:

 27.002. Application of Chapter

 

 (a) this chapter applies to:

 

 (1) any action to recover damages resulting from a construction
defect, except a claim for personal injury, survival, or wrongful
death or for damage to goods[.]

 

 . . .

 

 (b) To the extent of conflict between this chapter and any other law,
including the Deceptive Trade Practices-Consumer Protection Act . . .
this chapter prevails.

 

 27.004. Notice and Offer of Settlement

 

 (b) Within the 45-day period after the date the contractor receives the
notice, the contractor may make a written offer of settlement to the
claimant. . . . The offer may include either an agreement by the
contractor to repair or to have repaired by an independent contractor at
the contractor's expense any construction defect described in the notice
and shall describe in reasonable detail the kind of repairs which will be
made. 


 . . .


 (f) If a claimant unreasonably rejects an offer made as provided by this
section or does not permit the contractor or independent contractor a
reasonable opportunity to repair the defect pursuant to an accepted offer
of settlement, the claimant:

 

 (1) may not recover an amount in excess of:

 

 (A) the reasonable cost of the offered repairs which are
necessary to cure the construction defect and which are the
responsibility of the contractor; or

 

 (B) the amount of a reasonable monetary settlement offer made
under Subsection (n); and

 

 (2) may recover only the amount of reasonable and necessary
attorney's fees and costs incurred before the offer was rejected or
considered rejected.

 

 (g) If a contractor fails to make a reasonable offer under this section, or
fails to make a reasonable attempt to complete the repairs specified in
an accepted offer made under this section, or fails to complete, in a good
and workmanlike manner, the repairs specified in an accepted offer
made under this section, the limitations on damages and defenses to
liability provided for in this section shall not apply.

 

 (h) Except as provided by Subsection (f), in a suit subject to this chapter
the claimant may recover only the following damages proximately
caused by a construction defect:

 

 (1) the reasonable cost of repairs necessary to cure any construction
defect, including any reasonable and necessary engineering or
consulting fees required to evaluate and cure the construction
defect, that the contractor is responsible for repairing under this
chapter;

 

 (2) the reasonable expenses of temporary housing reasonably
necessary during the repair period;

 

 (3) the reduction in market value, if any, to the extent the reduction
is due to structural failure; and

 

 (4) reasonable and necessary attorney's fees.


 . . .

 

 (j) An offer of settlement made under this section that is not accepted
before the 25th day after the date the offer is received by the claimant is
considered rejected.

 

 . . .

 

 (k) . . . The trier of fact shall determine the reasonableness of an offer of
settlement made under this section.

 

 27.006. Causation

 

 In an action to recover damages resulting from a construction defect, the
claimant must prove that the damages were proximately caused by the
construction defect.


Act of May 24, 1999, 76th Leg., R.S, ch. 189, 1999 Tex. Sess. Law Serv. Ch. 663
(amended 2003).

 Country Village contends that the evidence was legally and factually
insufficient to support the jury's finding in question five (17) that the settlement offer
made by Country Village was not reasonable. It further asserts that under the Act,
"stigma" damages were unavailable unless the settlement offer was unreasonable, or
if the stigma was a result of "structural failure." Finally, it states that because the
settlement offer was reasonable, jury question number seven (18) does not support
liability, since it requires a "producing cause" rather than the "proximate cause"
required by the Act. (19)

 The Pattersons assert that the law and the evidence support the jury's finding
that the settlement offer was unreasonable, and that the jury's award of damages was
therefore not limited by the Act. They further assert that because Country Village did
not object to the form or content of the jury charge, any complaint about the
appropriate causation is waived.

 A. Reasonableness

 All of Country Village's sub-issues stem from one question: whether the
evidence was legally and factually sufficient to support the jury's finding that
Country Village's letter of December 29, 2000 was not a reasonable settlement offer
for the purposes of the Act. In the letter, Country Village stated that it would "repair
or cause to be repaired all of such items except as expressly included below to the
reasonable satisfaction of the Pattersons." The exemptions included the slanted
exterior column and the slope on the upstairs floor. The letter also stated that nothing
would be done to the porte-cochere except to paint some wood that had become
exposed. The letter also required that the Pattersons agree to pay the charges that
Country Village was seeking for unpaid extras. 

 The Pattersons agreed that the offer was acceptable with respect to most of the
matters contained therein. However, at trial and on appeal, they point to the
fluctuating charges for extras and Country Village's refusal to provide any
documentation in support of those charges as reasons why it would not be reasonable
to take Country Village at its word for the amount of extras that were owed. 
Furthermore, Robert offered an extensive explanation of why the offer "glossed over"
repairs that he felt were important, including the sloping floor and the porte-cochere. 
We also note that the Pattersons testified that Country Village's roofer made repeated
attempts to repair leaks in the roof, with little or no success. We further note that the
final arbiter of "reasonableness" suggested by the letter was an inspector who had a
long history of working with Schauer, and who inspected the home repeatedly during
construction. We conclude that the jury was presented with sufficient evidence from
which it could conclude that the offer was unreasonable, both in the repairs it offered
and the requirements it imposed on those repairs.

 Country Village directs our attention to three cases examining the sufficiency
of the evidence to sustain or reject a jury's finding on the reasonableness of a
settlement offer. See Gentry v. Squires Const., Inc., 188 S.W.3d 396, 409 (Tex.
App.--Dallas 2006, no pet.) (evidence sufficient to support finding that offer was
reasonable); Perry Homes v. Alwattari, 33 S.W.3d 376, 385 (Tex. App.--Fort Worth
2000, pet. denied) (evidence sufficient to support finding that offer was not
reasonable); Roubein v. Marino Home Builders, Inc., No. 13-01-711-CV, 2002 WL
1765579, at *4-5 (Tex. App.--Corpus Christi August 1, 2002, pet. denied) (not
designated for publication) (evidence sufficient to support finding that rejection of
offer was unreasonable). Country Village compares the facts of the present case to
the facts of the earlier opinions and suggests that these comparisons require us to
determine that the jury's finding was incorrect as a matter of law. However, we note
that in all these cases, the courts' opinions affirm the findings below; in none of the
cases does the appellate court substitute its judgment for that of the fact-finder. See
Gentry, 188 S.W.3d at 409 ("It is clear the . . . challenge is actually an attack on the
weight and credibility assigned to the evidence by the trial court. We will not
substitute our judgment for that of the trier of fact as to the credibility of the
witnesses."); see also Golden Eagle Archery, Inc. v. Jackson, 116 S.W.3d 757, 761
(Tex. 2003).

 We conclude that there is evidence that supports the jury's finding that Country
Village's offer of settlement under the Residential Construction Liability Act was not
reasonable. We also conclude that Country Village has not shown the evidence to be
so weak as to render the jury's verdict clearly wrong or manifestly unjust. We hold
that the evidence is legally and factually sufficient to support the jury's answer to
question five.

 B. Remaining issues

 We reach neither of Country Village's remaining sub-issues relating to the
Act--that stigma damages are unavailable and that the jury was not properly charged
on the causation the Act requires--because they presume that the settlement offer was
reasonable, and because we have found the evidence to be legally and factually
sufficient to support the jury's finding that the offer was not reasonable. We overrule
Country Village's second issue.

Liability and Damages

 In its third issue, Country Village contends that the evidence is legally and
factually insufficient to support the jury's answers on breach of contract, on breach
of warranty, and on damages. Specifically, Country Village asserts that:

  under the law governing breach of contract, only difference-in-value damages are available to the Pattersons, and not cost-of-repair damages;

 

  while the record contains evidence of the value of the house had
there been no defects, there is no evidence concerning the value
of the house as constructed but not repaired, and therefore
difference-in-value damages could not be calculated;

 

  the breach of warranty claim fails because the contract warranted
only that Country Village would construct the house
"substantially in compliance with the plans and specifications
selected and in accordance with good building practices," because
the contract disclaimed implied warranties, and because it is
impossible to determine what warranty the jury found was
violated;


  the parties' experts disagreed about the nature of the defects in the
house, and the dispute was such that the evidence is rendered
factually insufficient to support the jury's verdict;

 

  the Pattersons' experts' lump sum estimate of cost of repair is
insufficient because there is no way to deduct the cost of repair of
defects that are not supported by evidence; and

 

  the evidence of stigma damages is too speculative or conclusory
to sustain the verdict.


 The Pattersons respond first that Country Village's attacks on the underlying
legal theories have not been preserved--neither in objections to the evidence, nor in
objections to the charge, nor in the motion for judgment notwithstanding the verdict,
nor in the motion for new trial. They further contend that even if these arguments are
preserved, the legal theories are correct. Finally, they assert that the evidence as to
liability and damages is legally and factually sufficient.

 A. Preservation of Error

 The Pattersons are correct that Country Village presented none of its legal
theories to the trial court. Country Village neither directs us to where error was
preserved, nor presents us with any argument or authority suggesting that we may
review these arguments absent such preservation. See Tex R. Civ. P. 272, 274; Tex.
R. App. P. 33.1. We therefore review only those arguments that relate to sufficiency
of the evidence.

 B. Sufficiency of the Evidence

 Country Village raises a number of distinct evidentiary points relating to
liability and damages. We address each in turn.

 1. Warranty

 Country Village's first evidentiary point is that there is no evidence of any
express warranty outside the contract, and that an implied warranty is unavailable by
the terms of the contract. It further states that under Crown Life Insurance Co. v.
Casteel, because there is no way to determine which warranty the jury found to be
violated we must reverse this claim. See 22 S.W.3d 378, 388 (Tex. 2000). The
Pattersons respond that Country Village made no Casteel objection to the trial court,
that the waiver of warranty was premised on a valid "H.B.W. Warranty" that was
never obtained by Country Village, and that there was no valid waiver of the implied
warranty of good and workmanlike performance.

 The contract states that Country Village agreed to build the home "substantially
in compliance with the plans and specifications selected and in accordance with good
building practices." It further states that "Seller to furnish H.B.W. Warranty, and
there are no oral agreements, representations, conditions, or warranties, expressed or
implied, other than those written in this contract." Schauer testified that he never
supplied the Pattersons with any homeowner's warranty because the warranty
company he used went bankrupt while the house was being built. He did not inform
the Pattersons that there was no homeowner's warranty.

 In question seven, the jury was asked:

 Was the failure, if any, of Country Village Homes, Inc., to comply
with a warranty a producing cause of damages to Robert and Sherry
Patterson?

 

 . . . .

 

 "Failure to comply with a warranty" means either of the
following:

 

 a. Failing to comply with an express warranty.

 

 An express warranty is any affirmation of fact or promise made
by Country Village Homes, Inc., that relates to the construction of the
Pattersons' home and becomes part of the basis of the bargain. It is not
necessary that formal words such as "warrant" or "guarantee" be used
or that there be a specific intent to make a warranty.

 

OR

 

 b. Failing to perform services in a good and workmanlike manner.

 

 A good and workmanlike manner is that quality of work
performed by one who has the knowledge, training, or experience
necessary for the successful practice of a trade or occupation and
performed in a manner generally considered proficient by those capable
of judging such work.


The jury answered yes to this question. Country Village made no objection to the
form or content of the question. We therefore agree with the Pattersons that Schauer
did not raise any objection that asserted that either of these definitions was invalid. 
See Tex. R. App. P. 33.1. The jury's answer is therefore valid if supported by either
definition of failure to comply with a warranty. 

 2. Condition of the House

 Country Village contends that there is factually insufficient evidence to support
either the breach of warranty or breach of contract claims because liability "turns
upon the competing opinions of the experts and evidence concerning the condition
of the home including photographs." In its brief, it reviews the testimony of experts
from both sides and concludes that the evidence is factually insufficient to support
the jury's answers regarding Country Village's failure to substantially comply with
its contract and warranties with the Pattersons. The Pattersons respond that Country
Village raises only questions of weight and credibility, which are the province of the
jury and are not grounds for reversal in a factual sufficiency review. 

 In question six, relating to breach of contract, the jury was asked:

 Did Country Village Homes, Inc., fail to substantially comply with the
contract?


 Substantial compliance means that the essential elements
of the contract have been performed such that the work is
substantially completed.


The jury answered yes. Country Village did not object to the form or content of the
question. (20) 

 Country Village presented the testimony of a number of engineers and
construction professionals, all of whom stated that the Pattersons' house, while not
perfect, is not of sufficiently poor quality to merit a finding of liability. These experts
presented explanations for the problems with the concrete, the porte-cochere, the
sloping second floor, the leaking roof, the brick facade, the stone pillars, and the
out-of-alignment windows. 

 However, the Pattersons presented their own experts, who testified that the
problems were far greater than Country Village's experts would concede, and that the
house required drastic repairs. Among other problems, the Pattersons' experts
described severe structural defects that would require removal and replacement of the
roof and the beams that make up the second floor. The kitchen tiling and the exterior
brick would need to be removed and replaced.

 Country Village concedes that the evidence regarding the condition of the
house depends largely on the opinions of experts. It is not for us to determine which
set of witnesses was more credible. See Golden Eagle Archery, 116 S.W.3d at 761. 
We conclude that the evidence is factually sufficient to support the jury's finding of
liability for breach of contract and breach of warranty.

 3. Repair Damages

 Country Village maintains that the expert testimony regarding what repairs are
necessary and how much these repairs will cost is legally and factually insufficient
to support the jury's award of damages. It contends that because the Pattersons'
engineer did not prepare an itemized estimate of costs of the repairs he prescribed,
and because the CEO of the Pattersons' preferred repair company based his estimates
on the engineer's recommendations and also did not itemize costs, this expert
testimony cannot meet the Pattersons' burden to prove the repair costs are reasonable
and necessary. They further contend that a lump sum estimate is insufficient because
it does not enable the jury to deduct any amount for a defect which it finds to be
unsupported by evidence. The Pattersons respond that the experts' testimony was
detailed and specific, and that Knight stated that the dollar amount was reasonable
and necessary. The Pattersons do not answer Country Village's argument regarding
the inherent insufficiency of a lump sum estimate.

 In question eight, the jury was asked:

 What sum of money, if paid now in cash, would fairly and reasonably
compensate Robert and Sherry Patterson for their damages, if any, that
resulted from the conduct you found in response to Question No. 6
and/or Question No. 7?

 

 . . .

 

 a. The necessary and reasonable cost to repair the property.


The jury answered "$300,000.00." Country Village did not object to the form or
content of the question.

 It is not necessary to use the words "reasonable" and "necessary" to establish
the right to recover costs of repair. Ebby Halliday Real Estate, Inc. v. Murnan, 916
S.W.2d 585, 589 (Tex. App.--Fort Worth 1996, writ denied). However, the
Pattersons' engineer testified that he believed $300,000 to be a "reasonable" figure
to repair the Pattersons' house, and he also acknowledged that it was "necessary" to
repair the house. He testified specifically to the repairs he believed to be needed, and
why he believed that they were needed, although he did not break down the total to
assign specific costs to specific repairs. The engineer's $300,000 figure was taken
from an itemized estimate based on his recommended repairs that had been prepared
by the CEO of the Pattersons' preferred repair company. The engineer was not
cross-examined on the reasonableness and necessity of repair, only on the accuracy
of his opinion. 

 The CEO of the repair company testified that he prepared the $300,000
estimate based on the engineer's report, some other, minor reports, and an
independent evaluation of the Pattersons' house. He further stated that there was no
lesser repair that would put the property in the condition in which it was supposed to
be when it was first built. He stated that if someone agreed to pay him $363,414, he
would do all the work described by the engineer. He stated that his company had not
yet been hired by the Pattersons.

 We conclude that this testimony is legally and factually sufficient for the jury
to determine the necessity and reasonableness of the recommended repairs. The
authority which Country Village cites to the contrary is distinguishable as involving
no evidence of reasonableness. See Perry Homes v. Alwattari, 33 S.W.3d 376, 385
(Tex. App.--Fort Worth 2000, pet. denied) (proof of necessity and payment not
evidence that payment was reasonable); Ebby Halliday, 916 S.W.2d at 589 ("Mere
proof of amounts charged or paid does not raise an issue of reasonableness and such
amounts ordinarily cannot be recovered without evidence showing the charges were
reasonable"; mere evidence that homeowners believed repairs generally were
necessary is no evidence that specific work was necessary); GATX Tank Erection
Corp. v. Tesoro Petroleum Corp., 693 S.W.2d 617, 619-20 (Tex. App.--San Antonio
1985, writ ref'd n.r.e.) (mere proof of payment not evidence that payment was
reasonable). Here, evidence from expert witnesses establishes that all repairs are
necessary and why they are necessary, the reasonableness of the costs, and how the
experts compiled the costs. Furthermore, Country Village has pointed to no authority
in support of its contention that lump sum estimates are by definition insufficient as
a matter of law; its authority shows only that a lump sum estimate is not sufficient to
merit reversal of a jury finding of zero damages. See Fort Worth Hotel, Ltd. v.
Enserch Corp., 977 S.W.2d 746, 762 (Tex. App.--Fort Worth 1998, no pet.). 

 We conclude that legally and factually sufficient evidence supports the jury's
award of repair damages. 

 4. Stigma Damages

 Country Village contends that the jury's award of stigma damages is
unsupported because, as its appraiser testified, calculations of stigma are purely
theoretical exercises. It also asserts that absent evidence of an offer to purchase their
home at a reduced price, the Pattersons presented no evidence of stigma. The
Pattersons respond that stigma is recognized by Texas courts. They point out that
their realtor and their appraiser both testified to the effect of stigma on market value,
and that their appraiser set the market value of the house if repairs were made at
$575,000. 

 In question eight, the jury was asked:

 What sum of money, if paid now in cash, would fairly and reasonably
compensate Robert and Sherry Patterson for their damages, if any, that
resulted from the conduct you found in response to Question No. 6
and/or Question No. 7?

 

 . . .

 

 b. The difference, if any, as of June 21, 2000, between the fair
market value of the subject property assuming proper construction
and no defects and the fair market value of the subject property
assuming that all repairs have been satisfactorily completed and
discounting the property for stigma associated with the defects[.]


The jury answered "$250,000.00." Country Village did not object to the form or
content of the question.

 Stigma damages are allowed by Texas courts. See Perry Homes, 33 S.W.3d at 
385; Smith v. Levine, 911 S.W.2d 427, 434 (Tex. App.--San Antonio 1995, writ
denied). The Pattersons' appraiser explained his methodology, and described the
houses to which he compared the Pattersons' house. (21) Country Village's objections
go to the weight and credibility of his testimony as weighed against that of its own
appraiser. Once again, in our review of sufficiency of the evidence we may not
invade the province of the jury in evaluating weight and credibility of witnesses. See
Golden Eagle Archery, 116 S.W.3d at 761. The jury was entitled to rely on the
testimony of the Pattersons' appraiser over Country Village's appraiser. See id. We
hold that the evidence is legally and factually sufficient to support the jury's award
of stigma damages.

 We overrule Country Village's third issue on appeal.


Incomplete Record

 In its fourth issue, Country Village asserts that it is entitled to a new trial
because of defects in the reporter's record that has been filed with this Court. See
Tex. R. App. P. 34.6(f). Under Rule 34.6(f), an appellant is entitled to a new trial:

 (1) if the appellant has timely requested a reporter's record;

 

 (2) if, without the appellant's fault, a significant exhibit or a
significant portion of the court reporter's notes and records has
been lost or destroyed or--if the proceedings were electronically
recorded--a significant portion of the recording has been lost or
destroyed or is inaudible;

 

 (3) if the lost, destroyed, or inaudible portion of the reporter's record,
or the lost or destroyed exhibit, is necessary to the appeal's
resolution; and

 

 (4) if the lost, destroyed or inaudible portion of the reporter's record
cannot be replaced by agreement of the parties, or the lost or
destroyed exhibit cannot be replaced either by agreement of the
parties or with a copy determined by the trial court to accurately
duplicate with reasonable certainty the original exhibit.


Id. The parties agree that Country Village timely requested the reporter's record and
that Country Village is not at fault regarding any remaining flaws in the record.

 In April 2006, following numerous proceedings regarding the state of the
record in this appeal, this Court determined that a complete reporter's record had not
been filed. We remanded to the trial court for a hearing, and findings and rulings to
determine:

 (1) whether any exhibits have been lost or destroyed;

 

 (2) the number and type of exhibits that have been lost or destroyed;

 (3) whether the lost or destroyed exhibits are necessary to the
appeal's resolution;

 

 (4) if the court finds that exhibits have been lost or destroyed,
whether any duplicate copies of the exhibits exist which could be
substituted into the record;

 

 (5) if the court finds that the exhibits have been lost or destroyed,
whether such destruction was the appellant's fault; and

 

 (6) if the court finds that the exhibits have been lost or destroyed:

 

 (a) whether the lost or destroyed exhibits can be replaced by
agreement of the parties; or

 

 (b) with duplicate copies determined by the trial court to
accurately duplicate with reasonable certainty the original
exhibits.


See Tex. R. App. P. 34.6(f)(1), (2), (4). We expressed no opinion as to whether the
exhibits in question were necessary to the resolution of this appeal.

 The trial court held the hearing that we ordered, and in June 2006 entered the
following findings of fact and conclusions of law:

 Among the exhibits into which the court of appeals inquired
specifically are plaintiff's exhibit 22 and defense exhibit 181. 
Concerning those exhibits, this court finds: (1) that both have been lost;
(2) that plaintiff's exhibit 22 was a videotape and defense exhibit 181
was a cancelled check; (3) that neither is necessary to the appeal's
resolution; (4) that duplicate copies of both exhibits exist and can be
substituted into the record; (5) that neither of the exhibits [was] lost
through any fault of the appellants; and (6) that both exhibits can be
replaced with duplicate copies that this court has determined to
accurately duplicate with reasonable certainty the original exhibits.

 

 The duplicate exhibits with which plaintiff's exhibit 22 and
defense exhibit 181 can be replaced were exhibits 1 and 2 to the
hearings this court held on April 10 and 24. This court sends those two
exhibits to the court of appeals along with these findings and transcripts
of the two hearings. Exhibit 1 is a videotape that is a reasonably
accurate duplicate of the videotape admitted at the trial of this cause as
plaintiff's exhibit 22. Exhibit 2 is a reasonably accurate photocopy of
the cancelled check admitted at the trial of this cause as defense exhibit
181.


 The court of appeals also inquired specifically about defense
exhibits 49 and 50. This court has determined that those two exhibits
were not lost or at least, like the wretch in Amazing Grace, "once [were]
lost, but now [are] found." Exhibit 49 is a sewer pipe that this court
labeled and admitted as exhibit D-3 at the hearing on April 10. Defense
exhibit 50 was also some type of plumbing pipe. According to the
evidence adduced at the hearings in April, the staff of the 55th District
Court found two unlabeled pipes in [the court reporter's] office that
might have been exhibit 50--a yellow pipe and a copper pipe. Based on
the testimony of Ms. Manson and Mr. Reese at the hearing on April 10,
this court finds that the yellow pipe, labeled and admitted at that hearing
as exhibit D-4, is the pipe admitted at trial as defense exhibit 50. Along
with these findings and the transcripts of the April hearings, this court
sends to the court of appeals exhibits D-3 and D-4.


 At a hearing on April 10, counsel for the appellants noted that he
believed that plaintiff's exhibits 20, 21, 23, 24, 25, 26, and 27 were also
missing from the record [the court reporter] sent to the court of appeals. 
The court recessed the hearing on April 10 and directed counsel for
appellees to determine whether any duplicates existed of plaintiff's
exhibits 20, 21, 23, 24, 25, 26, and 27. Based on the evidence adduced
at the hearing on April 24, 2006, this court makes the following findings
concerning plaintiff's exhibits 20, 21, 23, 24, 25, 26, and 27: (1) that all
seven original exhibits have been lost; (2) that all seven were
photographs or collections of photographs; (3) that none of them is
necessary to the appeal's resolution; (4) that duplicate copies of exhibits
25, 26, and 27 exist and can be substituted into the record, but that no
exact duplicates exist of exhibits 20, 21, 23, and 24; (5) that none of the
exhibits was lost through any fault of the appellants; and (6) that
exhibits 25, 26, and 27 can be replaced with duplicate copies that this
court has determined to accurately duplicate with reasonable certainty
the original exhibits, but exhibits 20, 21, 23, and 24 cannot.


 At the hearing on April 24, this court labeled and admitted as
exhibit D-5 the photographs this court determined to be accurate
duplicates of plaintiff's exhibits 25, 26, and 27. The court sends exhibit
D-5 to the court of appeals along with these findings and the transcripts
of the two hearings.


 The court respectfully recommends that the court of appeals
accept exhibits 1, 2, D-3, D-4, and D-5 to the April hearings as sufficient
to complete the reporter's record in this cause.


(emphasis added; footnotes deleted.) 

 The trial court found that black-and-white photocopies of exhibits 20, 21, 23,
and 24 that were present in the appellate record did not accurately duplicate the
original exhibits. The evidence supports the trial court's finding. The photographs
sent to this Court by the trial court following the April 24 hearing bear an electronic
date stamp of August 13, 2003. That date matches the electronic date stamps
apparent on photocopies of photographs previously identified as exhibit 25, and does
not match the date stamps on photocopies previously provided to this Court and
identified as exhibits 20, 21, 23, and 24. The photographs sent to this Court after the
April 24 hearing do not appear to be adequate copies of exhibits 20, 21, 23, and 24. 
As found by the trial court, the record before us is incomplete. (22)

 Country Village challenges the trial court's conclusion that exhibits 20, 21, 23,
and 24 are unnecessary to the resolution of this appeal. Country Village contends that
because it is challenging the legal and factual sufficiency of the evidence, we are
required to review the entire record, and anything less than the entire record requires
an automatic remand for a new trial. Further, Country Village states that the
particular exhibits are necessary for this Court to evaluate the condition of the home,
which was at issue both for liability and damages. Country Village further states that
the black-and-white photocopies in our original record are insufficient to evaluate a
factual sufficiency complaint. Relying on the opinion of the Fourteenth Court of
Appeals, Country Village states that because it has been denied a "complete and
unquestionably accurate record on appeal," we are required to reverse and remand. 
See Owens-Illinois, Inc. v. Chatham, 899 S.W.2d 722, 733 (Tex. App.--Houston
[14th Dist.] 1995, writ dism'd).

 Additionally, Country Village contends that certain evidence was "mishandled"
in that the trial court failed to send certain exhibits to the jury room for deliberations,
and in allowing certain exhibits that were not in evidence to go to the jury. Country
Village suggests that these purported errors, combined with the Pattersons' attorney's
unobjected-to characterizations of Schauer as a "crook" or "crooked," amount to
"cumulative error" that would require us to grant a new trial.

 The Pattersons assert that since the only issue under the standard of review is
"whether there is any evidence more than a scintilla to support the findings," the
photographs--even if they support Country Village's position and undercut the jury's
findings--are irrelevant to a determination of whether a scintilla supports those
findings. Also, the Pattersons contend that the doctrine of cumulative error is without
merit because there is no reversible error and therefore nothing to cumulate, and
because the "archaic" doctrine is contrary to the current rules of appellate procedure
relating to reversible error and preservation of error.

 A. Exhibits 20, 21, 23, and 24

 Although it asserts that a new trial is automatic when a factual sufficiency
challenge is made on a record that is incomplete, Country Village cites to authority
that pre-dates the current Rule 34.6(f) of the rules of appellate procedure. See Town
of Flower Mound v. Teague, 111 S.W.3d 742, 766-67 (Tex. App.--Fort Worth 2003,
pet. denied) (distinguishing former rule 50(e), which did not take into consideration
whether lost or destroyed portion of record was necessary to resolution of appeal). 
Upon this Court's direction, the trial court held a hearing and determined that the
missing exhibits were not necessary to the resolution of the appeal. We agree.

 The photographs that the trial court found to be missing from the record were
referred to repeatedly in Country Village's case-in-chief. Schauer and Country
Village's experts all made use of the photographs in explaining how the problems
with the house are either non-existent or merely cosmetic and easily repaired. 
However, Robert specifically addressed the photographs, stating that the house "looks
great when you are looking at it from photos and videos. You can't really get a
feeling for the problems that are on it." He also contended that the photographs were
taken from angles that failed to reveal the problems with the house. We conclude that
this treatment of the photographs by both sides indicates that a review of the
photographs by this Court is not necessary to our resolution of this appeal. Both sides
concur that the photographs do not reveal any problems with the house. They
disagree instead about the import of the photographs. This is a question of weight
and credibility of the evidence, which remains the sole province of the jury, even
when we review the evidence for factual sufficiency. See Golden Eagle Archery, 116
S.W.3d at 761. We hold that the absence of exhibits 20, 21, 23, and 24 does not
hinder our review of the sufficiency of the evidence, and therefore that the exhibits
are not necessary to this appeal. (23)

 B. Mishandling of Exhibits

 Country Village contends that the trial court was required to send all evidence
into the jury room, and that based on the reporter's record submitted to this Court, the
trial court failed to do so. See Tex. R. Civ. P. 281. Country Village also contends
that certain exhibits not in evidence were permitted to go to the jury. The Pattersons
do not respond to these assertions in their brief to this Court.

 Rule 281 states that "the jury may, and on request shall, take with them in their
retirement . . . any written evidence . . . ." Tex. R. App. P. 281. Despite the
permissive language of the rule--"may, and on request shall"--the supreme court has
held not only that the rule is mandatory, but also that it "is self-operative and requires
no request from the jurors or counsel." First Employees Ins. Co. v. Skinner, 646
S.W.2d 170, 172 (Tex. 1983). If the rule is violated, we then review the record for
harm. See id. at 172-73 (reviewing court is to evaluate whole case to determine
whether denying jury opportunity to examine exhibits "was reasonably calculated to
cause and probably did cause the rendition of an improper judgment"); Formosa
Plastics Corp., USA v. Kajima Int'l, Inc., 216 S.W.3d 436, 464 (Tex. App.--Corpus
Christi 2006, pet. filed); Cruz v. Hinojosa, 12 S.W.3d 545, 550 (Tex. App.--San
Antonio 1999, pet. denied); Tex. R. App. P. 44.1(a)(1); Tex. R. Civ. P. 281. 

 Similarly, where exhibits that have not been admitted into evidence are allowed
into the jury room, we review such error for harm. See Mid-South Bottling Co. v.
Cigainero, 799 S.W.2d 385, 388 (Tex. App.--Texarkana 1990, writ denied)
("question on appeal . . . is whether the jury's verdict probably resulted directly from
the presence of a part of the deposition in the deliberation room"). For example, such
error is not reversible if there is no evidence that the jury considered the improper
exhibits, or if the exhibits are cumulative. See Annesley v. Tricentrol Oil Trading,
Inc., 841 S.W.2d 908, 911-12 (Tex. App.--Houston [14th Dist.] 1992, writ denied)
(trial court erred by allowing into jury room 50-page exhibit of which only two pages
were admitted, but error was harmless because appellant failed to show that jurors
considered additional pages), abrogated on other grounds by Van Allen v. Blackledge,
35 S.W.3d 61 (Tex. App.--Houston [14th Dist.] 2000, pet. denied); Harvey v.
Culpepper, 801 S.W.2d 596, 601 (Tex. App.--Corpus Christi 1990, no pet.) (where
deposition improperly allowed into jury room, no harm where deposition "presented
the jury with no new information and added nothing substantive for the jury to
consider").

 Country Village complains that plaintiff's exhibits 26 and 27 and defense
exhibits 176, 177 and 181 were not delivered to the jury. It further contends that
defense exhibits 30, 44-47, 175, and 178, none of which were admitted, were
impermissibly allowed into the jury room. Of these, Country Village proffers an
argument of harm regarding only defense exhibit 175. We hold that because Country
Village has not presented any argument as to plaintiff's exhibits 26 and 27 and
defense exhibits 20, 44-47, and 176-78, any error relating to these exhibits is
inadequately briefed, and therefore waived. See Tex. R. App. P. 38.1(h) (brief must
contain clear and concise argument for contentions made).

 Exhibit 175 is a computer document that the Pattersons' trial counsel stated
was created by Betty Morgan, the former employee of Country Village Homes, Inc.
and Vintage Homes. It bears the subject line "Payroll[,]" is dated April 25, 2002, and
states: "Kay, Monte called at 9:35am said to move eveything [sic] to vintage
including payroll, and he said anything comes in for dove manor charge it to
sandown[.]" In his argument to the trial court in support of Exhibit 175's admission,
the Pattersons' trial counsel stated that the document would support the assertion that
Schauer transferred all the assets of Country Village Homes, Inc. to other
corporations during the pendency of the present case. We hold that Exhibit 175,
having not been admitted into evidence by the trial court, should not have been given
to the jury in its deliberations. We further hold that the trial court's error was
harmless, because it is cumulative of Morgan's deposition testimony and Miller's live
testimony and because Country Village has not identified anything in the record that
shows that the jury considered the unadmitted document. See Annesley, 841 S.W.2d
at 911-12; Harvey, 801 S.W.2d at 601.

 C. Cumulative Error

 Finally, Texas courts recognize the doctrine of cumulative error, wherein a
reviewing court may reverse a lower-court judgment when the record shows a number
of instances of error, "no one instance being sufficient to call for a reversal, yet all the
instances taken together may do so." Sproles Motor Freight Lines, Inc. v. Long, 168
S.W.2d 642, 645 (Tex. 1943); see also Standard Fire Ins. Co. v. Reese, 584 S.W.2d
835, 840 (Tex.1979); Smerke v. Office Equip. Co., 158 S.W.2d 302, 305 (Tex. 1941);
Nat'l Freight, Inc. v. Snyder, 191 S.W.3d 416, 424 (Tex. App.--Eastland 2006, no
pet.); Univ. of Texas at Austin v. Hinton, 822 S.W.2d 197, 205 (Tex. App.--Austin
1991, no pet.). However, Country Village's contention that the doctrine applies to
errors "unobjected to or otherwise" that taken together would lead to improper
judgment is incorrect. In the first supreme court case to which it cites, the court
found error to be preserved without prompt objection when error was made; however,
error was still presented to the trial court by a motion for new trial. See Smerke, 158
S.W.2d at 305. The court held that a party is not required "to take a chance on
prejudicing his cause with the jury by making the objection," but nowhere did it hold
that the complaining party is excused from ever presenting error to the trial court. See
id.; see also Cook v. Sabio Oil & Gas, Inc., 972 S.W.2d 106, 112 (Tex. App.--Waco
1998, pet. denied) (complaint of cumulative error "not preserved for appellate review
because the ground now asserted for mistrial was not presented to the trial court"). 

 Country Village contends that the Pattersons' trial counsel twice referred to
Schauer as "crooked" or "a crook," and that even unobjected-to, this error should be
cumulated with any other error that we might find to be harmless, and would thus
merit reversal. Country Village never raised this specific objection to the trial court,
nor did it raise any objection of cumulative error. We hold that Country Village has
failed to preserve any complaint of cumulative error. 

 We overrule Country Village's fourth issue on appeal.

Extras

 In its fifth issue, Country Village contends that the evidence is legally and
factually insufficient to support the jury's finding on question number one that
Country Village did not install any "extras" for which it was not compensated. It
contends that the Pattersons' evidence is conclusory, and cannot overcome Schauer's
direct testimony and the documentary evidence that shows that the Pattersons owed
approximately $32,000. The Pattersons respond that their expert's testimony was
sufficient evidence to create a fact issue for the jury. (24)

 Country Village points specifically to the following evidence:

  Schauer offered documents and gave testimony that detailed the
overages;

 

  the evidence showed Country Village was due $31,833.33;

 

  Robert acknowledged the extras and acknowledged that payment
was required;

 

  Robert testified that he does not know what is owed;

 

  The Pattersons' expert did not go into any detail regarding his
determination that Country Village owed the Pattersons $12,900.


 The Pattersons' expert, Kenneth Miller, testified that he examined several
boxes of documents produced in discovery to determine the validity of the charges
and that the Pattersons owed nothing. Indeed, he testified that his analysis showed
that the Pattersons had overpaid Country Village by $12,900. He explained to the
jury the procedure he used to analyze the documents. 

 We note first that Country Village's assertions under this issue (as well as the
Pattersons' responses thereto) primarily address the weight and credibility of witness
testimony, the evaluation of which is the sole province of the jury. Golden Eagle
Archery, Inc., 116 S.W.3d at 761. Furthermore, a jury's award of damages is legally
sufficient when the award falls within the range of damage amounts for which
evidence has been presented at trial. KMG Kanal-Muller-Gruppe Deutschland GmbH
& Co. KG v. Davis, 175 S.W.3d 379, 396 (Tex. App.--Houston [1st Dist.] 2005, no
pet.). Country Village presented some evidence that the Pattersons owed nearly
$32,000 for extras, and had at times sought even more; on the other hand, the
Pattersons' expert testified that Country Village owed nearly $13,000 for the
Pattersons' overpayments. The jury's finding of zero damages for extras falls within
the range of evidence presented. We therefore hold that the evidence is legally
sufficient to support the jury's finding. See KMG, 175 S.W.3d at 396. We further
hold that Country Village has not shown the evidence to be so weak as to render the
jury's verdict clearly wrong or manifestly unjust, or against the great weight and
preponderance of the evidence. We overrule Country Village's fifth issue.


 Conclusion


 We affirm the judgment of the trial court. 





 Elsa Alcala

 Justice


Panel consists of Justices Taft, Jennings, and Alcala.
1. The trial court awarded the Pattersons $162,890.41 in prejudgment interest.
2. "Extras" refers to changes or additions to the house beyond the contract. The term
"overages," used at trial almost interchangeably with "extras," refers more specifically
to purchases in excess of certain "allowances" in the contract. Any change to the
contract that increased cost to the builder would be an "extra." 
3. A "porte-cochere" is "a passageway through a building or screen wall designed to let
vehicles pass from the street to an interior courtyard" or "a roofed structure extending
from the entrance of a building over an adjacent driveway and sheltering those getting
in or out of vehicles." Merriam-Webster's Collegiate Dictionary (11th ed.
2003).
4. In July 2002, the Pattersons filed a Second Amended Third-Party Petition adding all
appellants in the present case as well as a number of other parties who have since
been severed or dismissed.
5. No home warranty inspector appears to be named in the letter. The inspector during
construction of the home was Billy Shaw, who testified at trial that he did not
remember much about the construction of the house, but attested to the validity of his
reports that gave the construction "a clean bill of health." Testimony at trial
established that the home warranty company for which Shaw worked went bankrupt
during the construction of the Pattersons' home, and therefore the Pattersons had no
warranty.
6. In its supplemental petition, Country Village added a claim for payment of more than
$11,000 for a set of windows.
7. Expansion joints allow the brick exterior to expand and contract as the weather
changes.
8. The expert was not clear about how much refund the Pattersons might be owed. At
one point he stated that the Pattersons were owed $12,190, and at another point that,
depending on the determination of one invoice, the Pattersons might be owed only
$6,800. The Pattersons did not sue for any refund.
9. Southern Union was decided after the events giving rise to this case occurred. S.
Union Co. v. City of Edinburg, 129 S.W.3d 74 (Tex. 2003). As a rule, court decisions
apply retroactively. Baker Hughes, Inc. v. Keco R. & D., Inc., 12 S.W.3d 1, 4 (Tex.
1999). 


 The Business Corporation Act has been superceded as of January 1, 2006 by the
Business Organizations Code. Tex. Bus. Org. Code Ann. § 402.001(a) (Vernon
2006). However, the Business Corporation Act continues to govern those events
before January 1, 2006. Id. § 402.006 (Vernon 2006). We therefore analyze this case
under the prior statute.
10. The legislature added the provision in article 2.21 § A(2) that requires an "actual
fraud" and the provision in 2.21 § B that preempts common law piercing of the veil
in response to the supreme court's decision in Castleberry v. Branscum. Tex. Bus.
Corp. Act Ann. art. 2.21 cmt. 1996; 721 S.W.2d 270, 272-73 (Tex. 1986). In that
case, the Supreme Court, relying on the common law theory of "sham to perpetuate
a fraud," approved a piercing of the corporate veil where there was a finding only of
constructive fraud, and not actual fraud. Castleberry, 721 S.W.2d at 272-73.
11. Country Village additionally points out in a supplemental post-submission letter brief
to this Court that the supreme court's opinion in Southern Union did not issue until
October 31, 2003, after judgment was rendered in this case. The supreme court in
Southern Union pointed out that article 2.21 governed contractual veil-piercing claims
since 1993, see 129 S.W.3d at 87-88, casting doubt on Country Village's contention
that Southern Union made new law. See also See Texas-Ohio Gas, Inc. v. Mecom, 28
S.W.3d 129, 137-38 (Tex. App.--Texarkana 2000, no pet.) (holding that article 2.21
controls all veil-piercing claims). Even assuming that Southern Union effected a
change in the law that otherwise would excuse Country Village from presenting its
contentions to the trial court, we note that Southern Union issued while the trial court
retained plenary power in the case. We further note that Country Village filed its
motion for new trial on November 5, 2003, after Southern Union had issued. Country
Village points out that a motion for rehearing was pending at the Supreme Court until
April 2004, after the trial court's plenary power would have expired; however, it
directs us to no authority that the pendency of a motion for rehearing somehow
deprives an issued opinion of its precedential value. 
12. Even if we were to expand our review to include Country Village's motion for new
trial and for judgment notwithstanding the verdict, its challenges are again only to the
sufficiency of the evidence to support the jury's findings. Similarly, in its motion for
judgment notwithstanding the verdict, Country Village asserts that the trial court
should disregard the verdict as to questions nine and ten because there was no
evidence to support the jury's answers.
13. We note that the definition of actual fraud in jury question ten tracks the definition of
actual fraud as defined in the comments of the Pattern Jury Charge on Alter Ego. See
Comm. on Pattern Jury Charges, State Bar of Tex., Texas Pattern Jury Charges:
Business, Consumer, Insurance, Employment PJC 108.2 Cmt. (2006). The Pattern
Jury Charge relies on the supreme court's language in Castleberry that states that
actual fraud "involves dishonesty of purpose or intent to deceive." Castleberry, 721
S.W.2d at 273 (quoting Archer v. Griffith, 390 S.W.2d 735, 740 (Tex. 1964)). The
supreme court also considered similar language in Southern Union, and did not
require a finding on the elements of common law fraud. 129 S.W.3d at 88.
14. The Pattersons concede that Country Village Homes, Inc. and the other entities did
not use a common business name, one of the factors from National Plan
Administrators that the trial court included in its charge to the jury. Nat'l Plan
Adm'rs, Inc. v. Nat'l Health Ins. Co., 150 S.W.3d 718, 745 (Tex. App.--Austin 2004,
pet. granted). 
15. Eventually Morgan became an employee of Vintage Custom Homes.
16. Although the legislature amended the Act in 2003, this present cause of action
accrued prior to those amendments. We therefore refer to the Act's earlier language. 
See Tex. Prop. Code Ann. § 27.002 historical note (Vernon Supp. 2006) ("changes
. . . apply only to a cause of action that accrues on or after the effective date of this
act.").
17. The Jury answered no to the question "Was Country Village Homes, Inc.'s letter of
December 29, 2000, a reasonable written offer of settlement to Robert and Sherry
Patterson?" There was no objection to the form or content of this question.
18. The Jury answered yes to the question "Was the failure, if any, of Country Village
Homes, Inc., to comply with a warranty a producing cause of damages to Robert and
Sherry Patterson?" "Producing cause" was defined as "an efficient, exciting, or
contributing cause that, in a natural sequence, produced the damages, if any. There
may be more than one producing cause." There was no objection to the form or
content of this question.
19. Country Village refers to question seven as "a DTPA question." The jury was not
charged on the Deceptive Trade Practices-Consumer Protection Act claim that had
been pleaded by the Pattersons.
20. Jury question 7, relating to Country Village's breach of warranty, is reproduced
above.
21. No objection was made to the admissibility of the stigma damage theory, nor was there any
Havner-like objection as to the validity of the underlying economic theory. See Merrell Dow
Pharms., Inc. v. Havner, 953 S.W.2d 706, 709 (Tex. 1997); see also Maritime Overseas
Corp. v. Ellis, 971 S.W.2d 402, 409 (Tex. 1998) (requiring objection to preserve error under
Havner).
22. The parties dispute whether Country Village should be bound by its concession at the
April 24 hearing that certain photographs provided by the Pattersons' attorney's
assistant were adequate copies of exhibits 20, 21, 23, and 24. The trial court,
however, apparently was not persuaded by the concession because it found that the
copies were inadequate.
23. We note that if we assume that the missing exhibits show--as Country Village
asserts--that the house has not changed over the years and therefore does not suffer
from structural defects, then the 2003 photographs in our possession would be
substantively identical to the missing exhibits, and therefore cumulative of evidence
already in the appellate record.
24. The Pattersons further contend that Country Village's contention that Kenneth
Miller's expert testimony was conclusory is not properly raised for the first time on
appeal. "When [a] challenge is restricted to the face of the record--for example,
when expert testimony is speculative or conclusory on its face--then a party may
challenge the legal sufficiency of the evidence even in the absence of any objection
to its admissibility." Twin City Fire Ins. Co. v. Vega-Garcia, 223 S.W.3d 762, 771
(Tex. App.--Dallas 2007, pet. filed). Country Village's challenge is a no-evidence
challenge, asserting that Miller's testimony is no evidence against Country Village's
claim for extras, and is preserved for appeal.